1
2
3
4
5                        IN THE UNITED STATES DISTRICT COURT
6                     FOR THE NORTHERN DISTRICT OF CALIFORNIA
7

8   MARK ZAVALA, AE8159,                    No. C 15-2247 CRB (PR)
9                    Petitioner,            **ORDER DENYING PETITION FOR A**
                                            **WRIT OF HABEAS CORPUS**
10      v.
11  MARK BITER, Warden,
12                   Respondent.
13  ————————————————————————/
14
15          Petitioner Mark Zavala, a California state prisoner proceeding with the assistance of
16  counsel, seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging a conviction and
17  sentence from Santa Clara County Superior Court.  For the reasons set forth below, the
    petition is denied.
18
                                    **STATEMENT OF THE CASE**
19
            Petitioner was convicted by a jury of three counts of robbery and assault with a
20
    firearm, along with various gun and gang-related enhancements.  People v. Zavala, No.
21
    H036028, 2013 WL 5720149, at *1 (Cal. Ct. App. Oct. 22, 2013), as modified on denial of
22
    reh'g (Nov. 21, 2013).  On April 26, 2010, the trial court sentenced Petitioner to thirty-three
23
    years in state prison.  Id., at *2.
24
            On October 22, 2013, the California Court of Appeal affirmed the judgment of the
25
    trial court and, on February 11, 2014, the California Supreme Court denied review.  See
26
    generally Zavala, 2013 WL 5720149, review denied (Feb 11, 2014).  On October 6, 2014 the
27
    Supreme Court of the United States denied certiorari review.  See Zavala v. California, 135
28
    S. Ct. 79 (2014).

On May 19, 2015, Petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in this Court.  See Pet. (dkt. 1).  Per order filed on July 2, 2015, the Court found that the petition, when liberally construed, stated cognizable claims under § 2254 and ordered Respondent to show cause why a writ of habeas corpus should not be granted.  See Order to Show Cause (dkt. 3).  On November 13, 2015, Respondent filed an answer.  See Response (dkt. 8).  Petitioner, now assisted by counsel, filed a traverse on March 14, 2016.  See Traverse (dkt. 19).

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the facts of the Prosecution's case as follows:

> At trial, R.B., who was then 18 years old, testified that he had been a friend of Kyle Moneyhun, whose street name was Ghost. Before the robbery, R.B. was living on the streets and spending most of his time with Moneyhun. At that time, R.B. was "kick[ing] it with northerners." Most of the people with whom he hung out were affiliated with northerners.

> Earlier on the day of the robbery, R.B. and Moneyhun went to Michelle's house, where they had been four or five times before, to drink. Everybody there was drinking. R.B. drank beer and smoked a joint.

> While at Michelle's house, R.B. heard people "talking about doing a robbery." One of the people was Mark, who had dark skin and a ponytail called a "chongo" at the back of his head. R.B. had heard other people refer to Mark as "Little Savage."

> Moneyhun was the person who came up with the idea of robbing a marijuana dealer named Mitch. Moneyhun had met Mitch through R.B. and both of them had bought marijuana from Mitch, who sold it from his garage. R.B. knew that Mitch had a safe, in which he kept his marijuana, in his garage. Around July 2008, R.B. was smoking marijuana daily, sometimes more than once a day. R.B. did not want to be involved in the robbery because Mitch was a "good drug dealer" and he wanted to continue buying from him. He was also concerned that Mitch would be able to identify him.

> In addition to Mark, J–Dog, and Michelle were among those who "wanted in" on the robbery. R.B. had met Mark and J–Dog once or twice before. Mark and Michelle had an argument about her participation because "she had a little kid." Mark told Michelle that she could not go and Michelle seemed upset. There was discussion about the need for cars to get away. The plan was to call SJU, the San Jose United gang, to obtain one or two cars for the robbery. Michelle was going to make that call to a friend. R.B. heard talk about obtaining guns. Mark indicated that he was willing to shoot if he had to. Mark left Michelle's house to get a gun.

At some point, everybody else left Michelle's house. Moneyhun and R.B. went to the light rail station. R.B. received a call from his friend Gabby, who lived next door to Mitch, while they were waiting for the light rail. Gabby had been Moneyhun's girlfriend for a while. Barrgan and Moneyhun took the light rail downtown, where they waited to be picked up.

The next day, R.B. and Moneyhun returned to Michelle's house. As they were leaving, the police arrived and they were taken to the downtown Campbell Police Department. R.B. was interviewed by an officer. He remembered telling officers that someone named J–Dog had been part of the discussion. R.B. testified that he did not want to be a snitch then and he did not want to be a snitch at trial.

R.B. testified that he did not recognize Mark or J–Dog in court but R.B. also remarked that the men looked different because their hair had grown out. At trial, R.B. picked out Mark, who had been at Michelle's house, from a six-photograph lineup, which was admitted into evidence. R.B. initially denied mentioning the name Peanut to police. After looking at the transcript of his recorded police interview, R.B. acknowledged that it appeared he had said Peanut was the person who would get the cars but he did not remember saying so and he did not know Peanut.

Jeffrey Allen McBee testified that, at roughly 6 p.m. on July 23, 2008, he was at his friend Mitchell French's house on Jones Way in Campbell. French had a recording studio in his detached garage. A male named Richard (also known as Oso) was there.

Around 6 p.m., McBee left French's detached garage and walked to the street, where he came upon four people, one woman and three men. It was a very bright summer day. At trial, McBee had no doubt that the three defendants were the three men in that group. McBee "got a strange vibe" from the group and asked, "What's happening, guys?" McBee had known French since high school and he knew most of his friends but he had not seen these individuals before.

McBee followed the group, which had entered French's backyard unannounced. McBee heard someone asking in a loud voice for Craig. McBee peered into the backyard from the gate and saw French standing outside the doorway to the garage. The people in the group were walking around the backyard, "checking out things," and asking for Craig. McBee estimated he was 15 to 20 feet from defendant Hensley and the others. French was telling them that there was no Craig there and they needed to get out of his backyard.

The group left the backyard and filed past McBee. McBee saw them head down the sidewalk toward the next door neighbor's house. When McBee asked who those people were, French said, " 'I have no idea who those guys were.' " McBee and Richard remained with French in the garage.

Sometime later, [Petitioner], who McBee described as Hispanic, stepped into the garage, signaled them to be quiet by putting his finger to his lips, and pulled out a revolver, which "looked like a snub nose .38 caliber pistol." Richard hit the deck and lay down. [Petitioner] ordered McBee to get down on the ground but McBee was paralyzed in fear. Defendant Hensley entered the doorway and blocked the exit. Hensley was holding a

3

pistol and pointed it at French. Someone commanded McBee to " 'put his stuff out on the table.' " McBee complied and put his cell phone on an electrical spool table.

[Petitioner] said to McBee, "Get the fuck down or I'll blow your fucking head off." He said it a couple of times in an angry and frantic voice and moved closer before McBee, who was in shock, lay down. Defendant Hensley, whom McBee described as white, was shouting orders at French.

McBee heard [Petitioner] tell defendant Hensley, "Watch those mother fuckers." Defendant Hensley said, "I got these mother fuckers. Don't worry. Just get going with the money." Defendant Hensley put his knee in McBee's back and put his gun to McBee's head.

Out of the corner of his eye, McBee could see that [Petitioner] had his gun on French, who was standing. French appeared terrified. [Petitioner] was striking French with a gun, swearing, and shouting commands at him to open his safe.

McBee could hear, but could not see, the safe being opened. McBee heard a conversation between [Petitioner] and French regarding a second safe. French indicated that the safe was not his and he did not know the combination. [Petitioner] or Hensley said to the other to make sure to take everything. McBee heard some rustling around in the room and then felt hands going through his pockets.

The victims were told to stay down and count to 100. Out of the corner of his eye, McBee saw someone grab a guitar.

When the victims got up, they found that a bass guitar and electric guitar were missing and the safe was wide open. McBee had lost a small amount of cash and some medical marijuana that had been taken from his pocket.

When the police arrived, McBee provided descriptions of the robbers. At trial, McBee testified that he definitely remembered defendant Hensley's and [Petitioner's] faces and the tattoos on Hensley's neck. McBee identified them as two of the group that had been there before the robbery.

[Petitioner's] haircut at trial was different from the haircut he had during the robbery. At the time of the robbery, [Petitioner] had a "homey cut," which McBee described as "a shaved head with a bun in the back and a little ponytail going down the back of the neck." McBee described the second robber, whom he identified as defendant Hensley, as Caucasian or white, in his late 20's or early 30's, between five foot, 10 inches to six feet tall, and about 180 pounds, with a tattoo on his neck.

McBee admitted at trial that, during the afternoon before the robbery, he had smoked approximately half of a marijuana cigarette. He had previously told police and testified that medication, by which he had meant marijuana, had been stolen from him during the robbery. R.B. indicated that French and he were medical marijuana patients.

McBee had reported to police that, on the day before the robbery, he had seen a suspicious person hanging out at the corner of Jones Way and Smith. He later learned that the person was Ghost.

4

McBee was shown multiple photographic lineups on different days by different officers. McBee believed that Richard Dowdy (Oso) was involved in the robbery because he told McBee that he was not going to identify people that he recognized from the incident.

Stephanie French testified that Mitchell French was her husband and they had two children. On the date of the robbery, her family resided at 835 Jones Way in Campbell and she and their children were at home. Her husband had two friends visiting, Jeff McBee and a man they knew as Oso, and the three men were in their detached garage. They had known McBee for about 10 years and he was a good friend of her husband.

At about 6 p.m. that day, three men and a woman entered through a side gate and came to Stephanie's open back door. The woman asked for someone named Craig. Stephanie told them no Craig lived there. Her husband came out of the garage and asked, " 'Who are you? What are doing in my backyard.' " She heard someone respond, "You don't know who you're messing with." Stephanie subsequently put her head back out and asked if everything was okay; French indicated they had left. At trial, Stephanie recognized defendant Hensley; she was certain that he was one of the people at her back door. She indicated the other males may have been Hispanic.

Stephanie knew that her husband had a safe in the garage. The safe contained over $1,000. According to her, French's friend had asked him to keep another safe for a month or two. Stephanie acknowledged that French was a medical marijuana patient. She denied having any knowledge that he sometimes sold marijuana from the garage.

French and McBee subsequently came into the house; French told Stephanie that they had just been robbed. Somebody called 911. The police arrived and separately interviewed each of them. Stephanie gave police a description of the person whom she identified at trial as defendant Hensley.

Wells French, who goes by the name Mitchell, testified. On July 23, 2008, he came out of his garage and saw a woman and some men whom he did not recognize in his backyard. They asked about a person named Craig and he told them a Craig did not live there. The female said, " 'You don't know who you're fucking with." They left through the gate.

French returned to the garage. At about 6 o'clock, French was in the garage with McBee and Oso. French acknowledged that he had smoked a little marijuana and had drunk a few beers.

When the incident began, the first thing French saw was a gun. He later described it to police as a snub-nose .38. The gun was pointed at his face and he was told to get down. Both his safe and a friend's safe were there. French was ordered to open his safe, which was "kind of hidden, but not fully." It contained "some pot and a lot of cash." He was struck in the back of the left knee and in his mouth. French subsequently told the officers that he was pistol whipped. When asked whether he was scared, French said, "Absolutely."

In addition, French's Motley Crue wallet was taken from his person and two guitars were taken from the garage, which was thrashed. He was on the ground during most of the incident. He heard them talking. He remembered being told to count to 100.

At trial, he said that he could not be 100 percent sure that anyone in the courtroom was in his backyard that day. French testified that he could not remember what the person holding the gun to his face looked like. He indicated that the incident happened very quickly. He gave descriptions to police after the incident and, at trial, he confirmed that he told the police the truth and the event was then fresh in his recollection. French recalled describing one person as a white adult male, about six feet tall, and about 180 pounds and with a tattoo on the right side of his neck.

French denied telling an officer that he received a death threat on his cell phone or that he was hiding out at a friend's house because he was scared for his life. He admitted repeatedly telling the prosecutor that he did not want to come to court and he was scared for himself and his family.

On cross-examination, French testified that he did not believe Oso had anything to do with setting up the robbery. French had known McBee since he was "a little kid" and he was 39 years old at the time of trial. French and McBee both had medical marijuana licenses; they smoked marijuana together.

French acknowledged sometimes keeping marijuana in his safe but he claimed that he ordinarily kept the money paid for using his recording equipment in it. He thought he had $800 to $1200 in the safe at the time he was robbed. He admitted that he had marijuana growing in his backyard.

French knew Ghost and he admitted giving marijuana to Ghose. French denied ever selling marijuana.

French indicated that the descriptions that he had given police were of the people he had seen in his backyard, not the robbers.

On redirect examination, French confirmed that he was 60 percent sure that defendants Hensley and [Petitioner] were the people who held him at gunpoint in his garage. On recross-examination, French recalled that, about a year earlier, he was asked whether anybody in court had come to his garage that day and he testified that he could not "make 100 percent identity" and none of the people looked familiar to him.

Richard Dowdy, who testified under a grant of use immunity, indicated that he did not want to be labeled a snitch. In July 2008, Dowdy was hanging out in French's detached garage located in the City of Campbell. McBee was there as well; they were playing music and drinking beer. Dowdy looked toward the door, saw a snub-nose revolver pointed at his face, and he immediately went to the ground. Dowdy had a prior robbery conviction and he knew the routine. He claimed that he kept his face down until the robbers left and he was not able to identify anyone.

Dowdy heard people talking to French; French was "making little noises like he's getting beat up." At some point, Dowdy was instructed to count to 100. Dowdy lost a cell phone, his car keys, and his wallet containing one dollar in the robbery.

Dowdy knew that French had a safe in the garage and there was another safe that belonged to one of French's friends in the garage. He described them as being in plain view.

Dowdy remembered talking to an officer shortly after the robbery. He indicated that he subsequently spoke with a detective, who treated him as a suspect and executed a parole search of his house.

Maria Elena Vasquez lived at 845 Jones Way at the corner of Smith Avenue. She testified that at around 6 o'clock in the evening on a day in July 2008, she saw her nephew, defendant Rodriguez, whom she identified at trial, outside her house and then he knocked on the door. Defendant Rodriguez told her that he had been dropped off. He was in her house for about five minutes and then he said he was leaving. At trial, she could not remember if she had seen him getting into a car. After she read the police report, she stated that he left in a car.

About 25 to 30 minutes later, looking out her south facing window, Vasquez saw a black Lexus stopped near the corner of Smith Avenue and Jones Way. Vasquez saw defendant Rodriguez standing on the street corner and looking around. Vasquez also saw a different nephew, Joseph, who was about 37 years old, getting out of a truck parked near the corner of Smith and Jones. She denied that she told officers that she saw what happened next but she admitted telling officers that she was looking out the south window of her house.

Vasquez acknowledged seeing two people run across the grass in front of her house toward Smith Avenue and defendant Rodriguez. She could not recall giving descriptions to police. A portion of the police report was read into the record: "Maria described S–3 as Hispanic male adult with a long ponytail on the back of his head. S–2 was described as a white male adult." Vasquez then recalled that the two people, a white male and a dark male, were running toward Smith Avenue and defendant Rodriguez and one had a guitar.

At trial, Vasquez initially could not recall telling an officer that she saw Joseph start running toward the Lexus but she later remembered that she had told the officers that information. Vasquez testified that she saw Joseph screaming and running toward Smith Avenue and the black Lexus when he was "going after the guys."

Vasquez saw defendant Rodriguez run from the corner toward the Lexus, but she claimed that she did not see defendant Rodriguez get into the Lexus. Vasquez could not recall telling an officer that she saw them loading property into the vehicle or she saw defendant Rodriguez get into the vehicle's back seat. Another portion of the police report was read into the record: "Maria said she was looking out of a window on the south side of her house and observed S–2 and S–3 loading the property into the vehicle."

Vasquez denied telling officers that she saw a person on the passenger side of the vehicle pull out a gun and shoot at Joseph. She saw the black Lexus drive away.

About 10 to 15 minutes after the incident, Vasquez received a call from defendant Rodriguez.

Vasquez said that she remembered being shown photographs by police but she had been unable to identify a photograph of either the driver or front seat passenger of the black Lexus.

Gabriella Vasquez testified. She lived at 845 Jones Way, which was on the corner of Smith Avenue. Mitch and his family lived next door.

Gabriella admitted that, on the night of the incident, she told police officers that she was scared to talk to them. She also confirmed that the police had come to her house and told her that she had to testify; she had told police that she was scared to testify and she did not want to be a snitch. She testified that she did not want to be a snitch.

Gabriella identified defendant Rodriguez in court and confirmed that he was a relative. At first, Gabriella could not remember that, on July 23, 2008, her attention was drawn to four or five people walking toward the backyard of the house next door. She denied seeing defendant Rodriguez walk to the next door neighbor's backyard. She admitted talking to a police officer on the night of the incident but she denied saying that she saw defendant Rodriguez walking toward that backyard with others. She could not remember telling police that she saw a male with a braided ponytail and shaved head, a white male with curly hair and glasses, defendant Rodriguez, and a female go to the backyard next door.

Gabriella recalled that defendant Rodriguez came to her home, visited, and left. She claimed that he was in her house about 30 minutes and she could not remember telling officers that he had been there for five to 10 minutes. She had been surprised to see defendant Rodriguez because she had not seen him for a year or two.

Gabriella did not remember telling an officer that she had seen "a black-colored, four door car, possibly a Pontiac." She acknowledged that a car drove away but indicated that she did not see the people with whom defendant Rodriguez left. She thought she might have told a police officer that they returned 30 minutes later.

Gabriella did not recall telling officers that she had seen defendant Rodriguez on the corner and denied saying that she had seen him run over to the car and get into the back seat. Gabriella did recall hearing her mother, who was at the window, say, "Oh, that's fucked up," and then going to the window herself. Gabriella saw her cousin Joe saying something and then being shot at. She heard the gunshot. She could not recall telling police that "the guy with the ponytail shot at him." She explained that a "chongo" was "a ponytail in the back of the head with no hair around it." After reviewing a transcript of her interview with police, Gabriella conceded that the interviewing officer had asked the length of the ponytail and she had indicated about six inches.

Although Gabriella could not remember telling the police many things at trial, she indicated that, on the evening of the incident, she had tried to tell the officers everything that she had seen.

On cross-examination, Gabriella remembered seeing a male with a ponytail and an otherwise shaven head, a male with brown, curly hair, defendant Rodriguez, and a female. She could not recall seeing a fifth person, specifically an older, more heavyset male wearing a white Raiders jersey. When asked where she was when she saw people walk toward Mitch's house, she indicated she was in the living room of her house looking out a window facing Jones Way. She also remembered the male with curly brown hair driving away in the car that had been parked on Smith Avenue facing west.

Gabriella knew Moneyhun and confirmed that he was known as Ghost. Around the time of the robbery, Moneyhun was coming over to her house and hanging around with her. She denied seeing Moneyhun go to Mitch's house and come back with marijuana but she admitted knowing that Mitch had marijuana.

Joseph Ramon Esquibel testified. On the night of the incident, Esquibel was returning to his home at 845 Jones Way, which was on the corner. When Esquibel drove up to his house, he saw a male, who he has since learned is related to him, standing on the corner. As Esquibel was walking toward his house, he saw two males, whom he had never seen before, coming from the house of his next-door neighbor Mitch and running across his lawn toward Smith Avenue. They passed within a couple feet of him. They had guitars and a tin can in their hands. Esquibel told the two, " 'This is not going to happen,' " by which he meant "robbing his neighbor." He told the people in his house to call 911. The two men went to a dark-colored vehicle facing westbound on Smith and jumped in.

Esquibel was on the sidewalk about five feet from the vehicle. The passenger pulled out a gun and Esquibel was scared that he was going to be shot. The passenger pointed the gun slightly away from Esquibel and fired. The bullet hit one of the rocks on the side of Esquibel's house and a piece of rock hit Esquibel in the face. Esquibel started running. He ran to the front of his house and then went to check on Mitch.

At trial, Esquibel could not recall telling the police many things or providing particular descriptions of the driver and passenger. He could not recall telling officers that the person standing on the corner appeared to be a lookout. Esquibel acknowledged that he had heard that his cousin, Victor Esquibel, was a category three member of the Nuestra Familia. Esquibel could not identify anyone in court but he acknowledged that on the night of the incident he gave descriptions of the two people who ran past him to police. Esquibel stated that he had told the truth to the police to the best of his ability and the incident was then fresher in his recollection than it was at trial. He remembered that the day after the incident he identified the shooter from a photographic lineup shown to him by an officer.

Esquibel testified that he told the truth to the best of his ability at the preliminary examination. His prior testimony regarding the heights of the driver and passenger was read into evidence.

Brian Sessions, an officer with the City of Campbell Police Department, testified. He was the first officer to arrive at Jones Way on July 23, 2008.

The first person with whom Officer Sessions made contact was Esquibel. Esquibel told Officer Sessions that he saw a white male and a Hispanic male running from his neighbor's house; they were carrying guitars. Esquibel told them to stop but they continued running. Esquibel gave descriptions of the two men. A salient feature of the white male was a visible tattoo on his upper chest; he was about five feet, 10 or 11 inches tall and had a thin build. The Hispanic male had a dark complexion and a braided ponytail.

Officer Sessions was told by Esquibel about an individual standing on the corner of Smith and Jones. Esquibel referred to him as "a lookout" and described him as a thin Hispanic male, five feet, four inches tall, approximately 22 years of age, who was wearing a black and white hat.

The officer said that Esquibel reportedly yelled into the house for his mother to write down the license plate. The man on the corner ran to the black Lexus, grabbed its rear license plate and, Esquibel believed, pulled the plate off the car. That individual then got into the back seat. The white male got into the driver's seat and the male with the ponytail got into the right, front seat of the black Lexus.

As Esquibel approached the vehicle, the white male told the front seat passenger, " 'Cap the mother fucker.' " The front seat passenger had pointed a black, snub-nose revolver at him and said something to the effect, " 'I'm going to fucking cap you,' or, 'I'm going to blast you[.]' " Esquibel feared he was going to be shot and backed up. The front seat passenger with a ponytail had turned the gun slightly and fired a shot in Esquibel's direction.

Officer Sessions also interviewed Richard Dowdy. Dowdy told him that he believed there had been two robbers because he heard them talking to each other but he had seen only the pistol pointed at him. He heard one tell the other, "Take everything you touch." He described the gun as a black, .38 caliber, snub-nose revolver.

Officer Sessions also spoke with McBee. McBee described the four people who had walked up to French's residence before the robbery: (1) a Hispanic male, (2) a white male in his late 20s, approximately 180 pounds, about five feet, 10 inches to six feet tall, with tattoos on his neck, (3) a Hispanic male adult, possibly with Pacific Islander heritage as well, with a dark ponytail and shaved head, and (4) a Hispanic female. McBee indicated that, during the robbery, the robber with the ponytail took money and some marijuana out of his pocket while he was lying on the garage floor.

Spencer Billman, a police officer with the Campbell Police Department, responded to 835 Jones Way at about 6:30 p.m. on July 23, 2008. He interviewed Stephanie French, who described four individuals who had come to her home that day. She stated that two of them were "possibly Mexican guys." A third was a white male adult, approximately six feet, one inch tall, with a thin build and a "snaggle tooth," in his late 20s. The fourth person was a Hispanic female adult in her late 20s.

From French, Officer Billman obtained descriptions of four individuals who had entered his backyard. French described a Hispanic male adult, a white male adult about six feet tall with tattoos on his neck, a black or

Hispanic mixed race male adult who had a braided ponytail of dark brown or black hair and an otherwise shaved head, and a Hispanic female adult.

Officer Billman was told by French that two of the original four had returned. The male with the ponytail had a handgun, a black snub-nose revolver, which he pointed at French. That person demanded to know the location of French's safe; he pushed French to the floor and pointed the gun at French's head. That person again asked about the location of the safe and pistol-whipped the right side of French's face. French opened the safe and the person stated, " 'Grab everything you can.' "

Carlos Guerrero testified that in July 2008, he was a police officer with the City of Campbell. On the night of the Jones Way robbery, Officer Guerrero interviewed Gabriella Vasquez. Gabriella indicated that she was scared to talk with him because her cousin was one of the suspects and she did not want to be a snitch. She indicated that her cousin and the people he hung out with were gang members.

Gabriella told Officer Guerrero that she had seen her cousin, defendant Rodriguez, passing by her house and then standing with others in the driveway of her next-door neighbor. She thought it was a group of about five people. In addition to defendant Rodriguez, she had described a male with a braided ponytail and an otherwise shaved head, a white male with curly hair and glasses, a Hispanic female about 17 or 18 years old, and an older, stocky Mexican male wearing a white Raiders jersey. She said that she saw the male with the braided ponytail and the male with the curly hair and glasses enter her next door neighbor's backyard and then come out after a very short time. The group began moving back toward her house. Defendant Rodriquez broke off from the group, he went to her front door, and he spoke to her very briefly. The rest of the group entered a black vehicle parked to the side of her house on the corner of Smith and Jones. The black car drove into the court on Jones Way and circled to the front of her house and yelled for defendant Rodriguez. He told Gabriella that he had to go, went to the car, and got into its back seat. Gabriella described the driver as having a light complexion, glasses, and curly brown hair. He had a tattoo on his upper chest and possibly on his right forearm. She told the officer that he looked "like a nerd" and the other males looked like gang members.

Officer Guerrero was told by Gabriella that, about 30 minutes later, she again saw a black vehicle. She heard the vehicle's driver say, "Cap that fool." She heard a gunshot.

A short time after the robbery, most likely the next day, Officer Guerrero interviewed R.B. R.B. and Moneyhun were together when Officer Guerrero picked them up at Michelle Stojkovic's house on the day after the robbery. The officer was under the impression they had a close relationship.

R.B. said that, on July 23, while he was at Michelle Stojkovic's house, there was talk about robbing someone who lived off Virginia. The intersection of Jones Way and Smith is approximately a half block off Virginia. R.B. indicated to him that Moneyhun and he were merely smoking and listening to the discussion. He thought J–Dog was there and Mark and J–Dog were "the main leaders of the conversation." R.B. did not

tell the officer that it was Moneyhun's idea to target French.

The officer testified that R.B. had reported that Mark and J–Dog talked about being desperate for money and drugs. Mark had said they needed some stolen cars to do the robbery. R.B. believed that two cars were going to be used in the robbery; he heard that Peanut from SJU was "the person who was going to come up with the cars." R.B. indicated there was an exchange in which Michelle said that she wanted to be involved but Mark told Michelle that she could not be involved in the robbery. Mark had a ponytail at the back of his otherwise shaven head, which R.B. referred to as a "chongo," which is Spanish for ponytail.

According to Officer Guerrero, R.B. indicated that he did not participate in the robbery because the proposed victim was his marijuana dealer, whom he knew personally, and he wanted to buy marijuana from French in the future. He told Officer Guerrero that he liked French and knew French had a family. R.B. explained that he did not warn French because he was afraid of retaliation and he did not want to get involved. He later backtracked, claiming that he really did not know French was the target.

R.B. told Officer Guerrero that, after leaving Michelle's house, Moneyhun and he had walked to the Campbell light rail station to take the light rail to the Discovery Museum. R.B. informed the officer that at 6:06 p.m., after reaching the light rail station, he received a call from Gabriella Vasquez and learned of the robbery and the gunshot.

Officer Guerrero showed photographic lineups to a number of individuals. French identified a photograph of Michelle Stojkovic as the suspect female and rated his certainty as eight or nine on a scale of 10. McBee was not able to identify her. French, McBee, and Dowdy did not identify defendant Rodriquez in a photographic lineup containing his photograph.

Natalie Gedman testified that she had met a person by the name of Peanut through acquaintances and seen him a handful of times before July 22, 2008. In court, Gedman identified defendant Hensley as Peanut. One night he came to her house and asked to borrow her car and she gave him permission to use it. She claimed her car was gone for about 24 hours.

At about 6:45 on July 23, 2008, Gedman received a telephone call from an unknown male from a private number telling her that her car would be parked outside. She opened the front door and discovered her keys were on a table on the front porch; her car was outside. She denied noticing that anything was wrong with her car.

At some point, Campbell police officers came to Gedman's house and asked her if she drove a black Lexus. She told them she did. She remembered telling the officers that she had lent her car to Peanut. She acknowledged that the police mentioned the license plate cover. She denied having any recollection that a coworker had pointed out to her that the vehicle's license plate frame was bent.

The following day, an officer returned with a photographic lineup. She looked at six photographs and picked out a person whom she said looked like Peanut but his hair seemed different.

Tom Rogers testified that he had been a Campbell police officer for 19 years at the time of trial. He was the primary investigating officer assigned to the case.

On the night of July 23, 2008, Officer Rogers spoke with Maria Vasquez and recorded their conversation. Vasquez reported observing, from inside her house, a vehicle pull up. Her nephew defendant Rodriquez came to the door and they talked. After leaving her house, defendant Rodriquez had entered a black Lexus vehicle with chrome rims and the car had driven away. The vehicle had contained three males and one female.

Officer Rogers was told by Vasquez that the vehicle returned about 30 minutes later. Two individuals, who Vasquez described as a Hispanic male with a long ponytail in the back of his head and a white male, started walking toward 835 Jones Way. Looking out from the front doorway, she later noticed them running back toward the vehicle with some property. She moved to the window. She saw the two men putting the property into the car. Defendant Rodriquez, who had been standing in front of her house, ran to the vehicle and got into the rear seat. She saw the male with the ponytail pull out a gun and fire one bullet in the direction of Esquibel. Officer Rogers had gone to the location and seen where the bullet had struck. It was the officer's impression that Vasquez was attempting in good faith to cooperate with the police investigation.

The next day, July 24, 2008, Officer Rogers picked up Esquibel and McBee and took them to view Moneyhun at another location where he was being held by detectives. During the field showup, Esquibel recognized Moneyhun and said, "That's Ghost." He said Moneyhun was not present during the robbery but Moneyhun had been at French's house a few days earlier. McBee did not recognize Moneyhun.

At about 4 o'clock on July 24, 2008, Officer Rogers showed a photographic lineup containing a photograph of [Petitioner] to Esquibel. Esquibel identified [Petitioner] as the person who had shot at him.

The next day, July 25, 2008, Officer Rogers contacted French at another person's house. French would not come out to the living room; he was in a back bedroom with the light turned off. The officer went to the bedroom and was able to convince French to turn on the light so they could talk. French explained that "he was scared for his life and he didn't want to stay home." French said that a death threat had been left in his cell phone's voice mail: "You're dead. We're coming after you."

Officer Rogers showed French the same lineup containing [Petioner's] photograph. French stopped at [Petitioner's] photograph and said, "I think that's him. The face looks the same." French identified him as the person who entered his garage and pointed a gun at him.

Officer Rogers learned from speaking to other officers and witnesses that French was a marijuana dealer and he was known to have safes in his garage.

13

On July 29, 2008, Officer Rogers showed a photographic lineup containing a photograph of defendant Hensley to McBee. McBee made a positive identification of Hensley.

Officer Rogers also showed a photographic lineup containing a photograph of defendant Hensley to Esquibel, but he was unable to identify the defendant. Officer Roger also showed a photographic lineup containing a photograph of defendant Rodriguez to Esquibel but Esquibel did not identify anyone.

At some point, Officer Rogers spoke to Michelle Stojkovic, who admitted to him that she went to French's house. She gave an innocent explanation for her presence. She said that she did not know anything about a proposed robbery.

Officer Rogers testified that defendant Hensley was arrested late on July 31, 2008 or in the early morning hours of August 1, 2008. The officer learned that [Petitioner] had surrendered to the Campbell Police Department on the morning of August 1, 2008.

On August 6, 2008, Officer Rogers showed French a lineup containing a photograph of defendant Hensley. French was unable to make an identification.

Officer Rogers also questioned Dowdy that day. McBee had shared his suspicion that Dowdy had been involved with the robbery because Dowdy told McBee that he was not identifying people whom he recognized in lineups because those people would be his "homies" if he "went away." When confronted, Dowdy told Officer Rogers that he was not going to snitch because that would be a death sentence for him in prison. Dowdy said he did not want anything to do with the case.

In the course of the investigation, Officer Rogers received information that the suspect vehicle, a black Lexus with chrome rims, may belong to defendant Hensley's girlfriend who lived off Branham Lane near Camden Avenue. On August 6, 2008, Officer Rogers located a black Lexus in that neighborhood in a carport; he noted that its rear license plate was bent up. The officer ran a registration check on the vehicle and obtained the name and address of the person to whom the vehicle was registered. Officer Rogers went to the particular unit and Gedman answered the door. Gedman's boyfriend, to whom the vehicle was registered, was already in custody and she was driving the car. She denied knowing the suspects and denied loaning her car to anyone.

The next day, officers conducted a probation search of Gedman's apartment. This time, Gedman told Officer Rogers that she had loaned the vehicle to Peanut on July 22 and then received a phone call about the vehicle at about 6:45 on July 23. A coworker had pointed out the bent license plate to her. Officer Rogers and another detective searched the vehicle. Dowdy's DMV medical examiner's certificate was found between the center console and the passenger seat.

Under the authority of a search warrant, Officer Rogers examined text messages sent from defendant Hensley's cell phone. A message sent at approximately 4:04 p.m. on July 22, 2008, said, "[K]eep this to yourself,

but I'm pushing against Northern Riders. Two hella fools tried to claim the title but they don't want to live the life." Several minutes later, he sent the message: "I got my own squad called WAR, Warriors and Riders, and we don't accept PCs, period, no rats, no pussies." At approximately 11:20 p.m. on July 22, 2008, defendant Hensley sent the message: "I got my Lexo and I'm mobile, solo. Can we meet?"

Dan Livingston, a sergeant with the City of Campbell, whom the court recognized as an expert with respect to Norteno criminal street gangs and street gangs in general, provided background information on the Nuestra Familia (NF) and Nortenos. Norteno street gangs emulate the NF and identify with the color red, the number 14, and the letter "N." Sureno street gangs identify with the color blue, the number 13, and the letter "M" for Mexican Mafia, which is basically their parent group. The Nortenos war with the Surenos on the streets.

Sergeant Livingston testified that the Shalu Gardens (SLG) gang has approximately 20 members, is an ongoing organization, and associates with northerners and it shares their common signs and symbols. The focal area of the gang is the "Nido/Adler area of Campbell off Winchester." The gang claims the City of Campbell as their territory and it had committed assaults throughout the city. When asked about the primary activities of the gang, the sergeant indicated that the gang had been involved in the sale of marijuana and methamphetamine, assault with a deadly weapon, auto theft, and robbery. His opinion about the gang's primary activities was based on prior arrests and investigations, conversations with crime victims and witnesses, and criminal histories of active members of the gang.

Sergeant Livingston estimated that he personally had been in contact with at least 10 separate Shalu Garden gang members. He identified those persons as gang members based on their tattoos, talking with them, observing their associates, and talking with victims and community members.

In Sergeant Livingston's opinion, the robbery was committed for the benefit of, at the direction of, and in association with the Shalu Gardens criminal street gang. That opinion was based on his review of the facts of the case, including the persons present at the planning stage, those "people who assisted along the way," and the manner in which the crime had been planned and carried out. The sergeant indicated that his opinion partially rested on the fact that the two primary people planning the crime, [Petitioner] and Rodriguez, were influential members of the Shalu Garden gang. This information was based upon "prior contacts, speaking with other people, reviewing police reports."

In his opinion, everybody else present during the planning stage was either a Norteno gang member or an associate. He believed that R.B. associated with Norteno gangs, Moneyhun was a Norteno gang member, Michelle Stojkovic was a Norteno gang associate.

Sergeant Livingston testified about two "pattern" offenses, one occurring on March 21, 2008 and another occurring on June 5, 2007. Certified copies of two conviction packages were admitted into evidence.

The March 21, 2008 offense was an assault involving four suspects at an elementary school. The victim was chased by the suspects and one of the suspects yelled, "Shalu," during the assault. Sergeant Livingston indicated that shouting out the name of one's gang during commission of a crime credits the gang, intimidates and scares the victim, and earns the gang and its member respect in the gang community. A gang member gains credibility through assaulting people, committing certain crimes, engaging in displays of violence and having lots of money from drug sales.

The June 5, 2007 crime involved three males in a car that approached a male walking in the area of 238 Curtner. Two men got out of the car. One of them, Rigoberto Patino, an SLG member, struck the male victim with a cane or stick and the other man called the victim a "scrap," a derogatory term for a Sureno gang member. When the victim tried to get away, the car ran over him and he was injured.

The sergeant explained that anyone who cooperates with police risks being labeled a snitch and being physically assaulted or worse. A community member that reports gang crimes may be terrorized or harassed by gang members.

In reaching his opinion that the crime was for the benefit of a criminal street gang, Sergeant Livingston also took into consideration the fact that they called on members of the Norteno San Jose Unidos to provide transportation for the robbery. He explained that "[o]ftentimes Norteno gangs will commit crimes with other Norteno gangs" and "tend to associate with each other, based on going into custody, family relationships, [and] going to school." The sergeant also considered the statement that was made during planning, "I have no problem shooting somebody if I need to." He stated a person is "not going to garner much respect in the gang community" if the person is "squeamish about using a gun...."

The sergeant's opinion was also buttressed by the fact the target of the robbery was a drug dealer. Gangs are involved with the sale of controlled substances and oftentimes know who is holding quantities of drugs. A targeted drug dealer is less likely to call or cooperate with police because the victim is himself committing a crime and because the victim may fear the gang members.

With respect to defendant Rodriguez's gang affiliation, Sergeant Livingston testified that defendant Rodriguez has four dots tattooed across the knuckles of his left hand. Defendant Rodriguez's moniker or street name, which is J-Dog, is tattooed on his right arm. The defendant "has an 'S' on his right forearm and a 'J' on his left, which stands for San Jose." The sergeant viewed the defendant Rodriguez's "MySpace" page and saw a photo of defendant with other gang members in which the defendant is holding up a "W" with his fingers, which indicates West Side San Jose. There was also a picture of him with Camilo Parra, an SLG member, who is holding up a "W" with his right hand. Defendant Rodriguez's "MySpace" page features the "gangster's prayer" on a red background. In the "about me" space, he talked "about the gang lifestyle and the Nido/Adler area." There is a picture of a handgun with several rounds of ammunition next to it and another picture of a bag of marijuana with the caption, "The more you smoke, the more ... I make."

16

Sergeant Livingston testified to a number of incidents indicating gang membership. On March 25, 2002, the San Jose Police Department became involved in an incident reportedly involving defendant Rodriguez. Defendant Rodriguez and another male had fought. Four days earlier, defendant Rodriguez challenged the male to fight after approaching and asking him what gang he was in and telling him that he, defendant Rodriguez, was in the West Side Mob. The West Side Mob is one of the larger Norteno gangs on the west side of San Jose.

In another reported incident, which occurred September 13, 2003, defendant Rodriguez, who at that time had the four dots tattooed on his knuckles and his moniker tattooed on his arm and was wearing a red shirt, attacked a Sureno affiliate and punched and kicked him. An hour earlier, defendant Rodriguez had called the victim a "scrapa," a derogatory term for a Sureno. The San Jose Police Department report described defendant Rodriguez as "a known affiliate with a Norteno gang."

During a January 25, 2004 contact between defendant Rodriguez and the San Jose Police Department, the defendant had a steak knife concealed in a pocket and a red rag in his rear pocket, and he claimed to be a Norteno. Defendant Rodriguez had explained that the knife was for his protection and "it's a rough neighborhood."

After a gang-related fight at Prospect High School on March 31, 2004, a vehicle in which defendant Rodriguez was a passenger was stopped by the San Jose police. When defendant Rodriguez was contacted, he indicated his Norteno gang affiliation. The driver was arrested for bringing a knife onto campus.

On August 19, 2005, defendant Rodriguez was contacted by Campbell police in the area of Nido and Adler behind 620 Nello, where [Petitioner] lived in unit one and Rigoberto Patino lived in unit four. In his pockets, defendant Rodriguez had a knife wrapped in a red bandana, a steak knife, and two large rocks. The previous night there had been a large fight in that vicinity involving the discharge of a gun. Officers had found a black SJ hat, a San Jose Sharks hat, and a bat in the street. Norteno gang members identify with the San Jose Sharks hockey team.

On November 19, 2005, the Campbell police received a report of a disturbance at a large apartment complex on Nido in the area of Nido and Adler and a complaint that the manager was being harassed by a large group. Officers, including Sergeant Livingston, responded. A large group walking away from the location was contacted. Some were dressed in gang clothing. Defendant Rodriguez was wearing a red jersey and a red and black Huelga bird hat; the Huelga bird is a common sign of Nortenos. He had a motorcycle chain. Defendant Rodriguez's brother was wearing a red shirt under a red sweatshirt. [Petitioner] was wearing a San Jose Sharks jersey. Victor Hernandez, a known SLG member, had a red bandana hanging out of his pocket. Ronald Delgado, a known SLG member, was wearing a black and white SL hat for Shalu and other members were either wearing red or black and white. Shalu members wear black and white when they do not want to draw a lot of attention to themselves. Sergeant Livingston spoke to Robert Denavario, a known SLG associate, who said all males with him were SLG members. A minor female, who said she was

a relative of Victor Hernandez, also said all males in the group were SLG members.

On December 16, 2005, Sergeant Livingston assisted in a probation search at 620 Nello, unit two. Defendant Rodriguez was there as well as the probationer. In a room containing items associated with defendant Rodriguez, Sergeant Livingston found a backpack with XIV written on the bottom and a Huelga bird. Inside the backpack, the sergeant found a CD with XIV and SLG written on it. In the closet, he found a shoe box containing SLG indicia and mail and other items with defendant Rodriguez's name on them. Marijuana packaged for sale was discovered in the backpack. While the search was being conducted, [Petitioner], Rigoberto Patino, and a third male attempted to intimidate the officers and were confrontational. Sergeant Livingston later received a notarized letter from defendant Rodriguez claiming the marijuana and backpack were his.

On July 24, 2008, during a classification interview, defendant Rodriguez admitted northern affiliation.

In an August 20, 2008 letter written to his estranged wife, defendant Rodriguez referred to himself as a "mother fucking solider at heart." Sergeant Livingston explained that gang members, and Nortenos in particular, often describe themselves as soldiers. The letter also indicated that a certain man would "get handled" if he continued to disrespect the defendant's mother and son and that his estranged wife could tell that man that he was not going to have to deal with only the defendant. According to the sergeant, this meant that the person would have to deal with somebody from the gangs.

With regard to defendant Hensley's gang affiliation, Sergeant Livingston's information came from four former male gang members who had dropped out. One had been a high ranking NF member and three were former members of Nuestra Raza. Three of the men had pending cases and were hoping to receive a lesser sentence by working with the sergeant; the fourth man, Mr. Lastra, had no pending case and was out of custody.

Sergeant Livingston had learned that defendant Hensley formerly was a member of Nuestra Raza, which is an arm of the NF, but he had left that organization and joined with the Northern Riders, a group forced out of the NF organization. A solid star on the left side of the head signifies membership in Nuestra Raza. The sergeant testified that defendant Hensley has a broken star on the right side of his forehead, which expresses disrespect for the NF organization. The defendant also has "W–A–R" tattooed on his neck. Mr. Lastra had told Sergeant Livingston that defendant Hensley claimed to be starting a new group called Warriors and Riders, which explained the significance of the "W–A–R" tattoo. Defendant Hensley's street name was Peanut.

In a 2002 police report, defendant Hensley was identified as a Norteno gang member by his ex-girlfriend's mother. At that time, the women were being harassed and were in fear for their safety because of defendant Hensley's gang association.

In 2007, defendant Hensley was directed to commit an assault at the direction of the Northern Riders because he had disrespected some members and, if he did not do so, defendant Hensley would be assaulted by an unknown Northern Rider. Sergeant Livingston testified about text messages that he believed had been sent by defendant Hensley. One message indicated to the sergeant that defendant Hensley was breaking away from the Northern Riders. Another text message stated, "I got my own squad called WAR, Warriors and Riders. And we don't accept PCs, period, no rats, no pussies." The sergeant explained that "PCs" refers to persons who have dropped out of a gang and are in protective custody.

As to [Petitioner's] membership in a gang, Sergeant Livingston stated that [Petitioner] has "SJ" tattooed on the back of his arms and "408," which is the area code, tattooed across this stomach. [Petitioner] also has a tattoo, which reads, "If I die today, no worries tomorrow." The sergeant explained that this tattoo reflects the mindset of a lot of gang members, who tend to live on the edge and believe if something happens to them, it is just part of "the game."

A police report indicated that on November 4, 2005 a police officer made contact with a person wearing a red shirt on Adler Avenue. The self-identified Norteno told the officer that he had been "jumped in behind 620 Nello at [Petitioner's] direction by an associate...." The gang member identified [Petitioner] "as running Shalu Gardens at that time."

On March 15, 2006, a search of [Petitioner's] residence, located at 620 Nello, unit one, was conducted by Sergeant Livingston pursuant to a warrant. The search uncovered gang indicia. Scribblings of "Shalu," "SLG," and similar terms and handgun ammunition were found in his room. In the garage, the sergeant found SLG graffiti and monikers carved into a bench.

On June 20, 2006, [Petitioner] was contacted at 240 Adler after police received a call reporting four males fighting and "somebody shouting something about a Shalu gang."

On November 24, 2006, [Petitioner] was contacted near 2369 South Winchester after a disturbance at a bar and the bouncer had asked certain people to leave. He was with Camilo Parra, whom the sergeant identified as an SLG member. Also, on November 24, 2006, a man flagged down police officers on Adler Avenue and he told them that three males, including [Petitioner] and Parra, had threatened him. Parra had said, "This is the north side. We run this area."

On April 3, 2008, [Petitioner] and Victor Hernandez were seen walking together through a Safeway parking lot in the area of Nido and Adler. [Petitioner] was wearing a red and white hat with "San Jose" printed on it.

On July 20, 2008, a San Jose police officer in the area of Lick and Alma advised other officers that "multiple car loads" of Nortenos were in the area looking to jump somebody. Another officer stopped a vehicle leaving the area; [Petitioner] was a passenger. Two other occupants in the vehicle had "NGN" tattoos, which stands for "Next Generation Nortenos," and were on probation with gang conditions. The vehicle contained a metal

wrench and stakes, which the reporting officer believed were weapons.

On cross-examination, Sergeant Livingston explained the police's use of field interview cards, which was one way of gathering information, including observations of tattoos and admissions of gang membership. In reviewing the material on [Petitioner's] past contacts with the Campbell Police Department, the sergeant had never found any reference to him being known by the moniker "Little Savage" or "Li'l Savage" aside from what R.B. had told police.

According to Sergeant Livingston, the SLG has been around Campbell since 2001 and the gang was formed by Camilo Parra. The sergeant stated that one of the primary purposes of the Shalu Gardens gang is robbery and at least three members had robbery convictions. He admitted that he had previously testified in March 2010, shortly before trial, that the SLG had not committed any robberies of which he was aware but he had also given the qualification that he would have to check the files. The sergeant believed that he had then explained that he had been belatedly brought into the case and he had not yet reviewed all the material. He acknowledged that the three robbers were juveniles at the time of the crimes. None of those robberies had been committed by defendant Rodriguez or [Petitioner].

Sergeant Livingston acknowledged that the original summary of Shalu Garden's predicate offenses, which he had written in about late 2005, did not list any robberies. Another summary of predicate offenses included six offenses committed on various dates through March 21, 2008 but it did not include any robberies. [Petitioner] was not named as a suspect or participant in those offenses. Insofar as the sergeant was aware, [Petitioner] had never been previously charged or convicted of robbery or any felony. Sergeant Livingston acknowledged that [Petitioner] did not have gang tattoos identifying him as a member of the SLG and that the police reports in this case that he reviewed did not indicate that any perpetrator identified himself as a Norteno or SLG member during the robbery.

On redirect examination, Sergeant Livingston stated that he had a conversation with defendant Hensley while he was in custody because the defendant had wanted to offer information in exchange for assistance in this case. Even though the sergeant specifically informed defendant Hensley that he did not want to talk about the specific facts of the present case, defendant Hensley told Sergeant Livingston that he was present during the crime.

Sergeant Livingston also testified regarding his 2005 encounter, while on patrol, with [Petitioner] and another man across from the defendant's house on Nello. Sergeant Livingston had spoken separately to the other man, who told the sergeant that he was a former NF member and was currently part of "New Flowers," a group of dropouts from the NF organization. The man asked the sergeant not to tell [Petitioner] because [Petitioner] was still active in NF and "he knew what [Petitioner] would do to him if [Petitioner] found out he was a dropout gang member."

Sergeant Livingston reiterated that the present crime, which he characterized as brazen, assisted the gang because it increased its status and provided drugs and property that could be sold. The money could be used

to buy guns to protect the gang and to buy alcohol and marijuana to entice others into the gang.

On further cross-examination, Sergeant Livingston confirmed that he had done nothing with the information obtained from defendant Hensley until he was called as an expert in this case.

On further redirect examination, the sergeant indicated that he does not document a conversation with an inmate who is offering information in exchange for help in a criminal case. He explained that officers try not to break the trust of the inmates willing to provide information to law enforcement since inmates would be less inclined to cooperate if they learned another inmate's statement had been used against him.

Janet Lacava testified that she knew [Petitioner] and had worked with him at the Safeway on Winchester in Campbell for a couple of years until he was transferred to another Safeway about the beginning of April 2008. When she knew him, he had a ponytail, which was approximately six to eight inches long. She identified him in court.

David Carmichael, a police captain with the Campbell Police Department, photographed [Petitioner] following his arrest on August 1, 2008. [Petitioner's] hair was cut "really short" and he did not have a ponytail. Captain Carmichael identified photographs of [Petitioner's] tattoos. His left arm has a tattooed "S" and his right arm has a tattooed "J." "408" is tattooed on his abdomen. The tattoo on his upper chest reads, "If I die today, no worries tomorrow."

Zavala, 2013 WL 5720149, at *2–23 (footnotes omitted).  The California Court of

Appeal summarized the facts in the defendant's cases, including Petitioner, as follows:

B. [Petitioner's] Evidence
Raj Jayadev, the executive director of Silicon Valley Debug, a community organization that provides assistance to families and youth, testified that the organization was contacted in late July 2008 by [Petitioner's] family who was seeking assistance in helping [Petitioner] turn himself in. Jayadev met with [Petitioner] and, at trial, he identified [Petitioner] in court. Jayadev and Aram James, an attorney that volunteered for the organization, drove with [Petitioner] by car to the Campbell Police Station. Jayadev sat in the rear passenger seat directly behind [Petitioner], who sat in the front passenger seat. [Petitioner's] hair was "short-cropped" and Jayadev did not see anything to distinguish any part of the back of [Petitioner's] head from the rest of his haircut.

Tiffany Shelton testified that she began dating [Petitioner] when he was 17 years old and she was 20 or 21 years old and she already had a son. Her son turned one while they were together and they later had a daughter.

Shelton was 25 years old at the time of trial. She identified defendant Rodriguez in the court room and indicated he was a friend of [Petitioner]. She had heard defendant Rodriguez called J–Dog.

[Petitioner] and Shelton began living together in his mother's Campbell home in 2005 and they moved into their own apartment in 2006. He started wearing his hair in a ponytail after the birth of their daughter in August 2007.

During the last week in January 2008, Shelton asked him to leave because he had been seeing someone else and lied to her about it. At that time, [Petitioner] was still wearing his hair in a "Mongolian," which was a ponytail at the back of his head and otherwise "bald."

After [Petitioner] moved out in January 2008, Shelton continued to see [Petitioner] and he regularly visited the children two or three times a week. [Petitioner] continued to contribute to her expenses and gave her $500 a month for rent.

According to Shelton, she discovered that [Petitioner] was no longer wearing his hair in a ponytail on July 5, 2008 when she was picking up her children from his sister's house and saw him.

Shelton testified that, on the afternoon of July 23, 2008, she got off work around 2 p.m., and then picked up both of her children, then about 11 months old and four years old, from daycare. Around 3:30 or 4 p.m., she met [Petitioner]at his cousin Eric's home in east San Jose. [Petitioner] did not have a ponytail at that time. [Petitioner] and she went to a bedroom and had sex. Her children stayed with Eric, his friend, and two or three of Eric's children; the children were in a little pool. [Petitioner's] mother also came to Eric's house but Shelton did not speak with her. Shelton left with her son when it was starting to get dark; [Petitioner] and their daughter did not go with her. According to Shelton, she returned the next morning to pick up her daughter and take her to school.

Shelton testified that [Petitioner] lost his Safeway job in about the middle of July 2008 and she learned about it approximately a week later.

Shelton was aware that [Petitioner] had turned himself in to the Campbell Police Department on or about August 1, 2008. She had dropped [Petitioner] off at the downtown office of Silicon Valley Debug. Since [Petitioner] had turned himself in, his family had been helping Shelton with her children, including watching them and picking them up from school when needed. She agreed that her life was going to be a lot tougher financially without the $500 contribution from [Petitioner].

Shelton said that, after [Petitioner] surrendered, she read a newspaper article about the incident that mentioned the date July 23, 2008. According to Shelton, she realized that was the date on which she had seen [Petitioner].

Shelton denied calling the Campbell Police Department to find out the charges or the date of the charged offense. She indicated that she had called the county jail to find out about the case. Shelton admitted that she had purchased and reviewed the police reports in this case. But Shelton denied reading them before giving a statement that [Petitioner] and she were

together on July 23, 2008.

Shelton conceded that she never called the Campbell Police Department to say that they had the "wrong guy." She acknowledged that she knew the location of the police department. She visited [Petitioner] twice a week while he was in custody. According to Shelton, she told Mr. Braun, [Petitioner's] trial counsel, and his investigator that she had not given the information that she had been with [Petitioner] at the time of the robbery to the police because of her many negative experiences with the Campbell Police Department. She claimed to have given that information to defendant [Petitioner's] first attorney.

Shelton had attended the preliminary hearing in April 2009. Shelton conceded that the first time anyone who was in the courtroom at trial heard that she was with the defendant at the time of the robbery was October 2009. Her 2010 trial testimony was the first time that she had told anyone in the judicial system that an innocent man was being prosecuted.

The parties stipulated that if Detective Rogers were recalled as a witness, he would testify that, when he showed the photographic lineup containing [Petitioner's] picture to witnesses, Detective Rogers knew that defendant [Petitioner] was the suspect.

Dr. Robert Shomer, an experimental psychologist, was qualified as an expert regarding the "psychological factors that go into human perception and eyewitness identification." He indicated that under the best of circumstances, an eyewitness identification is far less accurate than fingerprints, DNA, or blood samples. He described a number of studies. There were studies showing that misidentifications had occurred in criminal cases. He discussed the nature of perception and the factors that affect perception. Eyewitness identification can be very inaccurate.

Dr. Shomer indicated that a person's perception changes when a gun is being pointed at him. Research has shown that people are significantly less accurate about the face of a person wielding a weapon than the face of a person holding a pen or something innocuous.

According to Dr. Shomer, after 24 hours, the accuracy of remembered perceptions of a crime scene declines very steeply. Live lineups are far more accurate than photographic lineups because a witness sees the whole body in three dimensions.

Dr. Shomer stated that, in general, showing photographs of suspects one by one is more accurate than showing photographs all at the same time. An exception to this general rule occurs when the administrating officer is aware which photograph shows the suspect. In that circumstance, an officer is less likely to inadvertently influence the outcome if all the photographs are presented at the same time because the officer has difficulty knowing where the viewer is looking. The worst procedure is where the officer presenting the photographs knows the suspect's photograph and can tell which photograph is being examined. A change in the administrating officer's posture, an intake of breath, a focus of attention, or any verbal comment may inadvertently influence an identification. Ideally, the officer presenting the photographs should not know which photograph shows the

suspect in the case.

Two criteria were important for assembling a photographic lineup. First, every photograph should match the initial description to the same extent. Second, no photo should stick out like a sore thumb.

Dr. Shomer had an opportunity to view the photographic array for [Petitioner]. He criticized the lineup because only one photograph showed an open-mouth smile and teeth and the remaining photographs showed closed mouths and the person with the darkest complexion had the open-mouth smile. If the suspect was described as a Hispanic male with a dark complexion, only two photos met that description. If the suspect's description was a Hispanic male with a dark complexion and very short hair except for a ponytail, only one photo met that description. The other photograph of a dark-skinned male depicted a man who looked Persian, had very long hair, and very distinct chin hair.

Dr. Shomer judged the Campbell Police Department admonition given to witnesses before viewing a photo lineup to be "[p]retty good."

C. Defendant Hensley's Evidence
Defendant Hensley testified in his own behalf. In July 2008, defendant Hensley was using drugs on a daily basis. At the time of the robbery, he was "tweaked out on methamphetamine" and he did not think he would have committed the robbery otherwise. But he admitted that he knew he was committing robbery.

According to Hensley, on July 22, 2008, he borrowed a black Lexus from Gedman. He then contacted Smiley. He believed that his text message regarding a black Lexus, to which Sergeant Rogers had testified, had been sent to Smiley.

Defendant Hensley testified that, on July 23, 2008, defendant Hensley and Smiley drove their cars, picked up someone named Listo who got into Smiley's car, and continued to a 7–Eleven. There, the three of them met Michelle and others. Defendant Hensley stated that four or five people got into the Lexus with him. [Petitioner], whom he did not know, got into the front passenger seat. Defendant Rodriguez, whom Hensley did not know, Michelle, whom he knew as "Little One," and one or two others got into the back seat. As defendant Hensley continued driving, following Smiley's car, there was a conversation about "robbing some white connect" "for some drugs." The cars stopped; defendant Hensley got out of the Lexus and met with others. He understood that they were going to rob a drug dealer for "dope and money."

Defendant Hensley drove to Jones court and parked on the south corner of Smith and Jones behind Smiley. Defendant Hensley stated he did not have a gun; only [Petitioner] had a gun.

According to defendant Hensley, everyone in the Lexus got out and all of them, except defendant Rodriguez, went to a house on Jones court. They knocked on the door, a male opened the door and let them in, and Michelle asked for "Craig." They decided they were at the wrong house. They

24

proceeded to the house next door and entered the backyard through the gate. Michelle asked for "Craig" and spoke with a female. French was standing in the doorway of the garage and said that they had the wrong house. They left the backyard.

Defendant Hensley went back to the Lexus, backed it into the court, and told everyone to get in. Defendant Rodriguez had gone to his family's house to draw their attention away. Somebody in the Lexus called for defendant Rodriguez.

Defendant Hensley and Smiley drove their cars to a gas station. There, defendants [Petitioner], Hensley, and Rodriguez and Michelle, Smiley and Listo made a plan to go back to the house and "rob the connects for everything they had...." Eventually, [Petitioner], Hensley, and Rodriguez headed back to Jones. Defendant Rodriguez stayed on the corner to look out for people coming to "make a drug transaction"; [Petitioner] and Hensley returned to the targeted residence on Jones court.

Defendant Hensley described the crime. [Petitioner] entered the garage first and said, "Get the fuck on the ground." People were already getting down as defendant Hensley entered. [Petitioner] said to French, who was not yet on the ground, "[W]here the fuck's the safe's at?" Defendant Hensley said, "Get on the ground."

At first, French acted as though there was no safe. French eventually "kind of crawled" toward the safe and opened it; [Petitioner] was with French. Defendant Hensley denied putting a knee on anyone's back. [Petitioner] demanded a second safe and told French, " 'I'm going to blast you. Where's the fucking safe at?' " He put the gun's barrel on French. Defendant Hensley may have said, "Take everything you touch." Defendant Hensley did go through the victims' pockets. He indicated to [Petitioner] that it was time to go.

Defendant Hensley grabbed two guitars on the way out and [Petitioner] was carrying a duffle bag. They headed quickly toward the car. A man appeared and tried to grab a guitar from defendant Hensley, saying something to the effect, " 'What are you doing with my friend's shit?' " Defendant Hensley was telling him, " 'Back the fuck up. Just back the fuck up.' " Defendant Hensley heard the male yell, " 'Get the license plate number.' " Defendant Hensley handed one guitar to defendant Rodriguez and, with a free hand, he bent the license plate up so it could not be read. Defendant Hensley threw the guitar into the back seat of the Lexus and jumped in.

Defendant Rodriguez was in the back seat and [Petitioner] was in the front passenger seat. Defendant Hensley yelled out to [Petitioner], " 'Blast that mother fucker.' " [Petitioner] leaned out the window and told the man to back up or he was going to blast him. [Petitioner] fired a shot and defendant Hensley thought the man had been hit and he drove away.

Defendant Hensley stopped the car, got out, bent the license plate down, and then continued driving. He told defendant Rodriguez to lie down so the car appeared to have only two occupants. Eventually, the three went their separate ways.

At trial, defendant Hensley identified [Petitioner] and Rodriguez in the courtroom. [Petitioner] previously had a Mongolian hair style, which is "a short haircut with a big ponytail."

Defendant Hensley explained that the broken star tattoo on his forehead meant "[b]reaking free from oppression." He affirmed that the broken star was a symbol of the Northern Riders, which is considered to be a gang by law enforcement and the state prison system. Defendant Hensley viewed Northern Riders as a movement, not a gang. Northern Riders would say that leaders in NF oppress the underlings in their organization. Northern Riders are opposed to the philosophies of NF and Nuestra Raza. He identified Aaron and Sean, the names tattooed on his wrists, as his blood brothers. The tattoo "Sicilian" refers to his mother's side of the family. The tattoo "WAR" on his neck was an incomplete tattoo of the word "warrior." Members of Northern Riders consider themselves to be warriors. NF or Nuestra Raza members consider themselves to be soldiers. Soldiers take orders while "[w]arriors do what they feel is right." Nortenos and Northern Riders are enemies.

Defendant Hensley admitted sending the text messages about pushing against Northern Riders and WAR. He indicated that he was separating himself from the Northern Riders. Defendant Hensley acknowledged saying in the text that he had his "own squad called WAR, Warriors and Riders" but he claimed that at the time he sent the text he was by himself.

Defendant Hensley asserted that he participated in the July 23, 2008 robbery to obtain drugs and money for his own benefit. He did not have a gang-related motive and he did not commit the robbery for the benefit of, or in association with, gang members. He admitted, however, that at the time of the robbery, he knew Smiley, Listo, and defendants [Petitioner] and Rodriguez were Nortenos. Smiley had connections with Varrio Horse Shoe, a Norteno street gang. Listo was from SJG or San Jose Grande, which is another Norteno street gang. Defendant Hensley had to assuage Smiley's and Listo's concerns in order to "hang out" with them. Defendant Hensley confirmed that he was known as Peanut.

Defendant Hensley acknowledged his prior convictions of felony assault upon a peace officer and grand theft. He was testifying in the hope of receiving a lesser sentence than he would otherwise. While in custody, he offered to provide information in exchange for consideration in this case. Sergeant Dan Livingston had come to see him.

D. Defendant Rodriguez
Defendant Rodriguez presented no evidence.

E. Stipulations

The People and defendant Hensley stipulated that SJU or San Jose Unidos or United is a Norteno street gang. They also stipulated that Stephanie French was briefly present in the courtroom during the preliminary hearing. The People and [Petitioner] stipulated that his last day with Safeway was July 13, 2008. The People and all the defendants stipulated that, if Officer

1
2
3

Billman were recalled to testify, he would testify that when he responded to the crime scene on the night of the crime, he spoke to Mitchell French and French said that he believed he lost approximately $2,200 from the safe during the robbery.

4

Zavala, 2013 WL 5720149, at *18–23 (footnotes omitted).

5

## STANDARD OF REVIEW

6
7
8
9
10
11
12
13
14

This Court may entertain a petition for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Id. § 2254(d).

15
16
17
18
19
20
21
22
23
24
25
26
27
28

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

27

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in Supreme Court holdings (as opposed to dicta) as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

## DISCUSSION

Petitioner makes seven claims for relief under § 2254: (I) failure to dismiss jurors due to unauthorized communication with the jury; (II) failure to examine jurors due to unauthorized communication with the jury; (III) denial of a requested jury instruction regarding unauthorized communication with the jury; (IV) failure to instruct jurors regarding uncorroborated accomplice testimony; (V) misinstruction of jurors regarding the sufficiency of witness testimony to prove facts; (VI) denial of Petitioner's motion to bifurcate trial of gang enhancement and the other counts; and (VII) improper admission of testimonial hearsay through the prosecution's gang expert. The Court will address each of the claims in the foregoing order.

I.   French's Communication Only Warranted Dismissal of Juror No. 9

Petitioner claims that the trial court's failure to dismiss jurors who received alleged "private communications" violated his Sixth Amendment rights to a fair jury trial that is based solely on evidence presented at trial. See Pet. at 2–6. The claim is without merit.

A defendant's due process rights can be violated by private extrajudicial communication, however the standard one must meet is high. "[P]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." Mattox v. United States, 146 U.S. 140, 142 (1892). Thus, to fall under the Mattox rule, a communication must be: (1) private, (2) possibly prejudicial, and (3) between

jurors and third persons, witnesses, or officers in charge.  The jurors in Petitioner's case received no private communication.  Therefore, the <u>Mattox</u> rule does not apply.

A.      The communication in question

Petitioner argues that Mitchell French ("French") communicated privately to the jurors during direct examination by the prosecution.  <u>See</u> Traverse at 6.  During a bench conference, while counsel and the court were having a discussion, French faced the jury and mouthed "they did it" while pointing to the defendants and making an obscene gesture at them.  <u>See</u> <u>id.</u> Neither the judge nor counsel saw this communication.  <u>See</u> <u>id.</u>  Juror 9 alerted the court as to French's communication by way of a written note, at a recess toward the end of the prosecution's direct examination.  <u>See</u> <u>id.</u>

As a result of this communication, the trial court called the jury back into the courtroom, outside of the presence of witness French, to determine what happened and what course of action the court would take.  <u>See</u> <u>id.</u> at 6.  During this meeting, the court determined that only Jurors No. 5 and 9, who indicated that they had seen or heard French, were possibly prejudiced by the communication.  <u>See</u> <u>id.</u>  Jurors No. 2, 3, and 6 informed the court that they had observed "non verbal communication or attempted communication" from French.  <u>See</u> <u>id.</u> at 24.  However, the court did not inquire as to whether or not they were prejudiced by the communication.  <u>See</u> <u>id.</u>  Juror No. 9 informed the court that she could not remain neutral after the communication, and was dismissed.  <u>See</u> <u>id.</u> at 6.  The court questioned Juror No. 5 and determined that she was not prejudiced, and could stay on the jury.  <u>See</u> <u>id.</u> at 11.

The California Court of Appeal summarized the facts of the communication as follows:

> Before French left the witness stand, the court and counsel were made aware of a note written by Juror No. 9 indicating that French had been making facial gestures at defendants and, at one point, he had faced the jury, shielded his mouth, pointed at defendants, and mouthed, "They did it." The note stated that French had also made a " 'FU' " finger gesture at defendants.
>
> On further cross-examination at the end of French's testimony, [Petitioner's] counsel asked French whether he had said or mouthed

anything to the jury or made any gestures indicating one or more of the defendants while the attorneys were conferring with the judge. French answered, "Nope."

Following an unreported sidebar conference with counsel and outside the presence of witness French, the court ascertained that two jurors (Jurors No. 5 and 9) had seen or heard French mouth or make a statement not in response to questioning by counsel and three jurors (Jurors No. 2, 3, and 6) had seen some sort of a nonverbal or attempted communication by French. The record indicates that the court confirmed that the jurors who had heard French say something or had read his lips were Jurors No. 5 and 9 and asked the deputy to remove the other jurors. The court separately spoke with Jurors No. 5 and 9.

Juror No. 9 confirmed that she had witnessed what she had written in her note. The juror indicated that she would not be able to assess French's credibility without considering what had been seen and the conduct was coloring her perception of French's testimony. The court ultimately excused Juror No. 9.

Juror No. 5 had also seen French point to defendants and mouth, "They did it." This juror indicated that she had not seen any other kind of verbal or nonverbal communication by French. The juror understood that jurors were the sole judges of witness credibility and that testimony constitutes the evidence. The juror affirmed that she could put aside what she had seen, she could keep those observations from entering into deliberations, and she could judge French's testimony and credibility without reference to that conduct. The court told the juror that the matter could not enter into her deliberations and could not be discussed with fellow jurors. The court found that there was no need to rehabilitate Juror No. 5 because she had not "indicated in any fashion that she's prejudiced as a result" of observing French's volunteered statement.

The court refused the request of [Petitioner's] counsel to further question Juror No. 5. The court denied the requests of defendants' counsel to remove Juror No. 5.

With regard to the other three jurors, the court determined that it was unnecessary to question them and they could consider what they had seen because French's conduct constituted demeanor, which was relevant to his credibility. [Petitioner's] counsel asked for Jurors No. 2, 3 and 6 to be excused and moved for mistrial since there would be an insufficient number of jurors to continue and because the jury had been "hopelessly" infected. The court denied the motion for mistrial.

Zavala, 2013 WL 5720149, at *26.

> B.    The communication was not private, therefore jurors did not need to be dismissed

Petitioner contends that Jurors No. 2, 3, 5, 6, and 9 witnessed some form of communication from French, which rendered them unfit for jury service. See Pet. at 5–7.

Petitioner claims that French's communication was private, actually prejudicial, and between a witness and the jurors.  See Traverse at 6–7.  Thus, Petitioner argues that under the United States Supreme Court decisions in Mattox and Remmer v. United States, 347 U.S. 227 (1954), the communications violated his Sixth Amendment rights to fair trial.

As a preliminary matter, the Court of Appeal determined that:

> In this case, as a threshold matter, it is not clear that Juror No. 5's observation of French's communication constitutes juror misconduct. French was under oath on the witness stand when he volunteered a communication and gestured while counsel and the court were conferring. Evidence Code section 766 provides: "A witness must give responsive answers to questions, and answers that are not responsive shall be stricken on motion of any party." According to a well respected treatise, "[t]estimony of a witness that is not in response to any question falls into the same category as a completely nonresponsive answer." (Jefferson's Cal. Evidence Benchbook (4th ed. 2012) § 28.60, p. 536.) In contrast, in Caliendo v. Warden of California Men's Colony (9th Cir.2004) 365 F.3d 691, upon which defendants [Petitioner] and Rodriguez rely, a critical prosecution witness spoke with multiple jurors in the hallway for approximately 20 minutes. (Id. at pp. 693, 698.)

Zavala, 2013 WL 5720149, at *28.

The Court of Appeal did not find conclusively that Juror 5's viewing of French's communication constituted juror misconduct because French was on the witness stand at the time of the communication.  See id.  Therefore, the Court of Appeal found that the communication was tantamount to a non-responsive answer made by a witness.  See id.  The Court agrees with the Court of Appeal that the communication does not qualify as a private communication. Therefore, Petitioner does not satisfy the first prong in the Mattox standard. See Mattox, 146 U.S. at 142.  Because the communication is not private, the verdict is not invalidated.  See id.

Even if the Court found the communication to be private under Mattox, the trial court dispelled any possibility of potential harm by examining the impact of French's communication on Jurors No. 5 and 9.  The court found that Jurors No. 2, 3, and 6 did not read French's lips or hear his communication.  See Zavala, 2013 WL 5720149, at *26.  These jurors could not reasonably be affected because they did not witness French's statement. Therefore, the court's examination of only Jurors No. 5 and 9 was appropriate as they were

the only jurors to actually witness French communicate "they did it."  The court found that Juror No. 9 could not remain impartial, and excused her. See id.  However, Juror No. 5 could remain impartial, and she remained on the jury panel.  See id.  Thus, French's statement was harmless to Petitioner because the court released from service the only juror who was negatively affected by French's communication, Juror No. 9.  Additionally, French's communication was arguably harmless because it is wholly consistent with his trial testimony, which also implicated Petitioner's guilt.  See Zavala, 2013 WL 5720149, at *2–13.  The communication did not affect the remaining jurors.

Because French's communication was not a private communication, and because the court dismissed the only juror who was biased by the communication, the Court of Appeal did not reject Petitioner's argument in a manner contrary to clearly established federal law, as is required under § 2254.  Accordingly, Petitioner's claim is denied.

II.     The Court Did was Not Obliged to Examine Jurors No. 2, 3, and 6

Petitioner next argues that the trial court erred by refusing to examine—or allow defense counsel to examine—Jurors No. 2, 3, and 6.[1]  See Pet. at 6–7.  As discussed supra, French's communication was not private and therefore the Mattox rule does not apply in Petitioner's case.  See supra Section(1)(B).  Additionally, the trial court determined that only Jurors No. 5 and 9 heard French or read his lips while he communicated the statement in question to the jury.  Zavala, 2013 WL 5720149, at *26.  Because Jurors No. 2, 3, and 6 did not hear or see what French said, his statement could not be prejudicial to the jurors, as Mattox requires.  See Mattox, 146 U.S. at 142.

---

[1] Petitioner argues in his traverse that the trial court erred by not allowing counsel to have any part in examining Jurors No. 5 and 9.  See Mot. at 8–12.  Petitioner did not raise this claim in his petition.  See generally Pet.  It is the practice of this Court to provide Petitioner with the opportunity to file a traverse to present additional argument and legal authority.  However, a traverse is not the proper pleading to raise additional grounds for relief.  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).

1    Thus, the Court of Appeal's decision regarding the alleged failure to examine Jurors

2  No. 2, 3, and 6 was made in accordance with clearly established federal law.  Petitioner's

3  claim must therefore be denied.

4  III.    No Jury Instruction Regarding Unauthorized Communication with the Jury was
            Warranted
5

6    Petitioner argues that the trial court unfairly denied his request for a curative jury

7  instruction after French's communication, in violation of his Fourteenth Amendment rights.

8  See Pet. at 8; Traverse at 29.  Petitioner's argument fails for two reasons: (1) French's

9  statement was not grounds for juror misconduct, and therefore no instruction to the jury was

10  warranted; and (2) the Court of Appeal did not depart from clearly established federal law in

11  its analysis of Petitioner's claim.

12    The Court of Appeal thoroughly addressed Petitioner's argument:

13    After the parties rested, [Petitioner's] counsel requested the following jury
      instruction: "This relates to during the discussion at the bench between the
14    attorneys and the Court, the witness, Mr. French, made certain signals and
      gestures which were observed by some members of the jury which he
15    denied making. You may not discuss or consider any information conveyed
      by these gestures, but you may consider the fact that he made the gestures
16    as serious misconduct on his part, and the fact that he falsely denied
      making them in assessing his credibility." The trial court declined to give
17    that proposed instruction.

18    On appeal, [Petitioner] argues that the jurors who did not see French make
      any signal or gesture may have learned of it from one or more of the jurors
19    who saw something and may have been prejudiced. He maintains that the
      court's refusal to give the proposed instruction created the "substantial
20    possibility that one or more jurors was biased" against him as a result of
      French's behavior and violated his rights to jury trial and due process.
21    Defendant Rodriguez attempts to join in these contentions.

22    Reviewing courts "will not presume greater misconduct than the evidence
      shows." (In re Carpenter (1995) 9 Cal.4th 634, 657.) Moreover, it is "the
23    general rule that a trial court may properly refuse an instruction offered by
      the defendant if it incorrectly states the law, is argumentative, duplicative,
24    or potentially confusing [citation], or if it is not supported by the "substantial
      evidence [citation]." (People v. Moon (2005) 37 Cal.4th 1, 30.) It is a trial
25    court's duty to "inform the jury in all cases that the jurors are the exclusive
      judges of all questions of fact submitted to them and of the credibility of
26    the witnesses." (§ 1127.) An instruction that " 'invite[s] the jury to draw
      inferences favorable to one of the parties from specified items of
27    evidence,' " is "considered 'argumentative' and therefore should not be
      given. [Citations.]" (People v. Earp (1999) 20 Cal.4th 826, 886.)
28    [Petitioner's] proposed instruction improperly invited the jury to draw

33

1    unfavorable inferences regarding French's credibility and the trial court
     properly declined to give it.
2

3    The trial court provided the jurors with adequate guidance on their
     evaluation of witness credibility and what constituted "evidence" that could
     be considered by them. They were directed not to let bias or prejudice
4    influence their decision. They were told not to be "biased against the
     defendants just because they have been arrested, charged with a crime, or
5    brought to trial." They were instructed that, in deciding the facts, they must
     "use only the evidence that was presented in this courtroom," and
6    "[e]vidence is the sworn testimony of witnesses, the exhibits admitted into
     evidence, anything else [the judge] told [the jurors] to consider as
7    evidence." The jurors were also told that the attorneys' questions were not
     evidence and "[o]nly the witness[es]' answers are evidence." The court
8    instructed them to "disregard anything you saw or heard when the court
     was not in session, even if it was done or said by one of the parties or
9    witnesses." The court gave specific guidance regarding the factors relevant
     to their evaluation of witness testimony and told them to set "aside any bias
10   or prejudice you may have." The court instructed: "If you decide that a
     witness deliberately lied about something significant in this case, you
11   should consider not believing anything that witness says; or, if you think
     the witness lied about some things but told the truth about others, you may
12   simply accept the part that you think is true, and ignore the rest." The trial
     court's refusal to give [Petitioner's] proposed instruction did not deprive
13   any defendant of a fair trial.

14

15   Zavala, 2013 WL 5720149, at *30-31 (footnotes omitted).  Thus, the Court of Appeal found

16   that the trial court's jury instructions were sufficient to fix any potential harm caused by

17   French's statements.

18        The Court of Appeal found that French's statements were not private, and that

19   therefore there was no misconduct under the Mattox rule as Petitioner argues.  See supra

20   Section(1)(B).  Furthermore, the trial court adequately determined the scope of exposure to

21   French's statements and addressed any potential juror bias issues by examining Jurors No. 5

22   and 9, and dismissing Juror No. 9.  See id.  Thus, any possible prejudice arising from

23   French's statement was ameliorated after French left the witness stand, and no limiting or

24   curative instruction to the jury was necessary.

25        A state trial court's refusal to give an instruction does not alone raise a ground

26   cognizable in a federal habeas corpus proceedings.  See Dunckhurst v. Deeds, 859 F.2d 110,

27   114 (9th Cir. 1988).  The error must so infect the trial that the defendant was deprived of the

28   fair trial guaranteed by the Fourteenth Amendment.  See id.  Here, the Court of Appeal

34

correctly upheld the trial court's decision not to grant a limiting instruction to the jury after French's communication. See Zavala, 2013 WL 5720149, at *30-31. The trial court dealt with French's communication sufficiently by examining Jurors No. 5 and 9. See supra Section(1)(B). There was no duty to instruct the jury, because any potential harm was corrected after French left the witness stand and Juror No. 9 was released. See id. No error existed that could have infected Petitioner's trial and deprived him of his Fourteenth Amendment rights. Therefore, the Court of Appeal's decision is in accordance with clearly established federal law.

French's statement was not grounds for juror misconduct because the trial court acted in an appropriate manner. Additionally, the Court of Appeal's decision is not contrary to clearly established federal law. Therefore, Petitioner's § 2254 claim regarding a proposed jury instruction is denied.

IV.    No Jury Instruction for Accomplice Liability was Warranted

Petitioner claims that the trial court's failure to instruct the jury regarding accomplice liability violated his rights under the United States and California Constitutions. See Pet. at 10; Traverse at 31. Petitioner's argument fails because no instruction was necessary, as decided by the Court of Appeal in accordance with clearly established federal law.

The Court of Appeal addressed Petitioner's claim:

> [Petitioner] contends that the trial court erred in failing to instruct the jury regarding accomplice testimony and the requirement of corroborating evidence and this error violated his constitutional rights to jury trial and due process. He maintains that both witness R.B. and co-defendant Hensley qualified as accomplices. Defendant Rodriguez joins in [Petitioner's] arguments.

> Section 1111 states: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense...." It defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." The statutory definition of accomplice "encompasses all principals to the crime (People v. Tewksbury (1976) 15 Cal.3d 953, 960), including aiders and abettors and coconspirators. (People v. Gordon (1973) 10 Cal.3d 460, 468.)" (People v. Stankewitz (1990) 51 Cal.3d 72, 90.)

"It is well settled that the phrase 'liable to prosecution' in section 1111 means, in effect, properly liable. Any issues of fact determinative of the witness's factual guilt of the offense must be submitted to the jury. Only when such facts are clear and undisputed can the court determine that the witness is or is not an accomplice as a matter of law. [Citations.]" (People v. Rodriguez (1986) 42 Cal.3d 730, 759; see People v. Williams (1997) 16 Cal.4th 635, 679 ["Whether a person is an accomplice within the meaning of section 1111 presents a factual question for the jury 'unless the evidence permits only a single inference.' [Citation.]"].)

"When a jury receives substantial evidence that a witness who has implicated the defendant was an accomplice, a trial court on its own motion must instruct it on the principles regarding accomplice testimony. (Boyer, supra, 38 Cal.4th at pp. 466–467.) This includes instructing the jury that an accomplice's testimony implicating the defendant must be viewed with caution and corroborated by other evidence. (Ibid.; see CALJIC Nos. 3.11, 3.18; CALCRIM Nos. 334, 335.)" (People v. Houston (2012) 54 Cal.4th 1186, 1223–1224.) Since there was evidence showing that defendant Hensley was a principal in the charged crimes (see § 31) and, therefore, an accomplice, the court's failure to give the appropriate accomplice instruction constituted error. (See People v. Avila (2006) 38 Cal.4th 491, 562; People v. Box (2000) 23 Cal.4th 1153, 1209, disapproved on another ground in People v. Martinez (2010) 47 Cal.4th 911, 948, fn. 10.)

On the other hand, the evidence was not sufficient to support a finding that witness R.B. was an accomplice. A defendant has the burden of proving that a witness is an accomplice by a preponderance of the evidence. (People v. Tewksbury (1976) 15 Cal.3d 953, 968.) A person's mere knowledge that a crime might be committed by another in the future or failure to prevent it does not make the person an aider or abettor and, therefore, an accomplice. (See People v. Horton (1995) 11 Cal.4th 1068, 1116; People v. Stankewitz, supra, 51 Cal.3d at pp. 90–91, People v. Moran (1974) 39 Cal.App.3d 398, 413.) "Providing assistance without sharing the perpetrator's purpose and intent is insufficient to establish that a person is an accomplice. (People v. Sully (1991) 53 Cal.3d 1195, 1227.)" (People v. Carrington (2009) 47 Cal.4th 145, 191.) There was insufficient evidence from which to draw a reasonable inference that R.B. intended to, and did in fact, aid, facilitate, promote, encourage or instigate the robbery. (See People v. Houston, supra, 54 Cal.4th at pp. 1224–1225.) There was also insufficient evidence from which to draw a reasonable inference that R.B. had the requisite specific intents to be a coconspirator in the robbery. (See People v. Jurado (2006) 38 Cal.4th 72, 120, 123.) Evidence of mere association with conspirators is not sufficient to support a finding that a person is a member of a conspiracy. (See People v. Cummings (1959) 173 Cal.App.2d 721, 728; see CALCRIM (2012 ed.) Nos. 415, 416, pp. 186, 193.)

"A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record. (People v. Hayes, supra, 21 Cal.4th at p. 1271.)" (People v. Lewis (2001) 26 Cal.4th 334, 370.) " '[E]vidence independent of the testimony of the accomplice must tend to connect a defendant with the crime itself (and not simply with its perpetrators).' [Citations.]" (People v. Szeto (1981) 29 Cal.3d 20, 44.) "Corroborating evidence may be slight, entirely

circumstantial, and entitled to little consideration when standing alone. (People v. Nelson (2011) 51 Cal.4th 198, 218; People v. Gonzales (2011) 52 Cal.4th 254, 303.) It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. (People v. Hayes, supra, 21 Cal.4th at p. 1271; People v. Negra (1929) 208 Cal. 64, 69–70.) It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' (Fauber, supra, 2 Cal.4th at p. 834.)" (People v. Valdez (2012) 55 Cal.4th 82, 147–148.)

Here, the record contains adequate corroborating evidence, independent of defendant Hensley's testimony (and even independent of witness R.B.'s testimony), tending to connect [Petitioner] and Rodriguez to the commission of the crimes. At trial, victim McBee was certain the three defendants were in the group that had gone into French's backyard and recognized the faces of [Petitoner] and Hensley from the robbery. Victims French and Esquibel identified [Petitioner] as a perpetrator in photographic lineups. Defendant Rodriguez was identified to police by relatives who had seen him at the time and in the vicinity of the crimes. The California Supreme Court has indicated that courts apply the Watson standard of review (People v. Watson (1956) 46 Cal.2d 818, 836) only in the absence of sufficient corroboration. (People v. Gonzales (2011) 52 Cal.4th 254, 304.)

[Petitioner] nevertheless argues that a court's failure to give an accomplice instruction violated his rights to a jury trial and due process and the judgment must be reversed unless the instructional omission was harmless beyond a reasonable doubt. He compares the failure to give an accomplice instruction to a failure to instruct on an element of the offense. He cites Neder v. U.S. (1999) 527 U.S. 1 (119 S.Ct. 1827), which held that a court's failure to instruct a jury on an element of a charged offense is subject to review under the Chapman harmless-error standard of review. (Neder v. U.S., supra, 527 U.S. at pp. 8–16; see Chapman v. California (1967) 386 U.S. 18, 24 [87 S.Ct. 824] ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].) The Supreme Court concluded in Neder that an erroneous jury instruction that omits an element of the offense did not "render Neder's trial 'fundamentally unfair,' as that term is used in our cases." (Neder v. U.S., supra, 527 U.S. at p. 9.) Likewise, a failure to give an accomplice instruction did not result in a fundamentally unfair trial in this case.

Further, [Petitioner] has not cited any authority establishing that accomplice instructions are grounded in or effectuate any federal constitutional right. We have found only law that undermines his contention. (See People v. Gonzales, supra, 52 Cal.4th at pp. 303–304 [discussing standard of review]; Cummings v. Sirmons (10th Cir.2007) 506 F.3d 1211 ["there is no constitutional requirement that the testimony of an accomplice be corroborated by independent evidence"], cert. den.(2008) 554 U.S. 907 [128 S.Ct. 2943].) Section 1111 merely "codifies common law concerns about the reliability of accomplice testimony. (People v. Tewksbury (1976) 15 Cal.3d 953, 967....)" (People v. Gonzales, supra, 52 Cal.4th at p. 303.) The failure to give an accomplice instruction did not violate the defendants' constitutional right to have a jury determine

whether every element of a charged offense was proved beyond a reasonable doubt (see Apprendi v. New Jersey (2000) 530 U.S. 466, 477 [120 S.Ct. 2348] ); it is not subject to the Chapman standard of review.

Zavala, 2013 WL 5720149, at *31–32 (footnotes omitted).  Thus the Court of Appeal found that even if the trial court erred in failing to instruct the jury regarding accomplice liability, sufficient corroborating evidence existed in the record such that the error would be harmless.

The Court of Appeal's decision is not contrary to clearly established federal law, as is required under § 2254.  A state trial court's refusal to give an instruction does not alone raise a cognizable ground in a federal habeas corpus proceedings.  See Dunckhurst, 859 F.2d at 114.  The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment.  See id.  Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury.  See Duckett, 67 F.3d at 745.  An examination of the record is required to see precisely what was given and what was refused and whether the given instructions adequately embodied the defendant's theory.  See United States v. Tsinnijinnie, 601 F.2d 1035, 1040 (9th Cir. 1979), cert. denied, 445 U.S. 966 (1980).  In other words, a full examination of the record provides adequate insight as to whether the instruction given was so prejudicial as to infect the entire trial and, in doing so, so deny due process.  See id.

The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  See Walker v. Endell, 850 F.2d at 475–76 (citing Henderson v. Kibbe, 431 U.S.145, 155 (1977)).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'"  Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S. at 155).

Petitioner has not met his burden of showing that the omission of the jury instructions was actually prejudicial to his case as is required under Dunckhurst.  See Dunckhurst, 859 F.2d at 114.  The record contains significant and sufficient evidence to convict Petitioner independent of any instruction given regarding accomplice liability.  The Court of Appeal noted extensive evidence in the record proving Petitoner's guilt.  See Zavala, 2013 WL

5720149, at *2–23.  Petitioner has not met the burden of proof under <u>Dunckhurst</u>, and has not

shown actual prejudice in his case resulting from the instruction omitted.  Therefore, the

Court of Appeal was correct in its decision to deny Petitioner's claim.  Because the court's

decision is not contrary to clearly established federal law, Petitioner's claim is denied.

V.    <u>The Trial Court Gave Adequate Instructions Regarding the Sufficiency of Witness
       Testimony to Prove Facts</u>

Petitioner next argues that the trial court misinstructed the jurors by "instructing them

that the testimony of any witness sufficed to prove any fact."  <u>See</u> Pet. at 16–17; <u>see also</u>

Traverse at 35.  Petitioner contends that the trial court gave this instruction without

explaining an exception to the instruction regarding testimony given by an accomplice.  <u>See</u>

Pet. at 17.  The Court of Appeal determined that the trial court was in error for failing to

explain the accomplice testimony exception—however—the error was harmless.  <u>See</u> <u>Zavala</u>,

2013 WL 5720149, at *33.  Therefore, Petitioner's argument fails because, as the Court of

Appeal correctly explained, the trial court's error was harmless given the totality of the

evidence in the record.

The Court of Appeal determined that:

> In a claim related to the failure to give an accomplice instruction,
> [Petitioner] argues that the court erred by instructing the jury that the
> testimony of a single witness sufficed to prove any fact. Defendant
> Rodriguez joins in these arguments.
>
> The trial court instructed: "The testimony of only one witness can prove
> any fact. Before you conclude that the testimony of one witness proves a
> fact, you should carefully review all the evidence." That instruction
> correctly states the general law with respect to witness testimony (see Evid.
> Code, § 411 ["Except where additional evidence is required by statute, the
> direct evidence of one witness who is entitled to full credit is sufficient for
> proof of any fact"] ). The court failed, however, to explain the exception
> to that rule for accomplice testimony. (See § 1111; CALCRIM (2012 ed.)
> No. 301, p. 81.)
>
> Even though the court erred by failing to explain the accomplice testimony
> exception to the general rule regarding the sufficiency of a single witness's
> testimony, the error was harmless. First, the court admonished the jury to
> carefully review all the evidence. Second, the court gave detailed and
> lengthy instructions to the jurors regarding assessing witness credibility.
> Third, there was ample corroborating evidence. It is not reasonably
> probable that [Petitioner] would have obtained a more favorable result if
> the court had instructed regarding the accomplice testimony exception to

the general rule regarding the sufficiency of a single witness's testimony. (Cal. Const., art. VI, § 13; People v. Watson, supra, 46 Cal.2d at p. 836.) For the reasons discussed above with respect to the failure to give an accomplice instruction, we do not believe the Chapman standard of review is applicable to this error. The instructional errors related to accomplice testimony did not remove an element of an offense from the jury's consideration (cf. Neder v. U.S. (1999) 527 U.S. 1, 8–15 [119 S.Ct. 1827]; People v. Flood (1999) 18 Cal.4th 470, 491–492).

Zavala, 2013 WL 5720149, at *33 (footnotes omitted).  Thus, the Court of Appeal held that even though the trial court erred in failing to explain the accomplice testimony exception to the rule regarding sufficiency of the evidence, the error was harmless.

As discussed supra, Petitioner has an "'especially heavy burden'" of proving that an error in instruction—particularly a failure to instruct—caused his trial to become so infected that his Fourteenth Amendment rights were violated.  See supra Section IV.  Here, Petitioner has not shown that an instruction regarding the sufficiency of the evidence would have changed the outcome of his trial, due to the overwhelming amount of evidence detailed in the Court of Appeal decision establishing Petitioner's guilt.  See generally Zavala, 2013 WL 5720149.  Thus, the Court of Appeal's decision to dismiss Petitioner's claim is not in violation of clearly established federal law.

Petitioner's claim is dismissed as it does not demonstrate a failure to follow clearly established law on the part of the Court of Appeal, as § 2254 requires.

VI.     No Clearly Established Federal Law Mandates Bifurcation of Trials

Petitioner argues next that the trial court erred by failing to bifurcate the trial of his gang enhancement from that of his robbery.  See Pet. at 17; Traverse at 36.  Petitioner contends that the alleged failure to bifurcate led to sustained and repeated attacks on his character that violated his right to a fair trial under both the United States and California Constitutions.  See Pet. at 20–21.  Additionally, Petitioner alleges that the introduction of evidence regarding his gang affiliation was so prejudicial that it rendered his trial fundamentally unfair.  See Traverse at 36.  Petitioner's claim fails because no clearly established federal law establishes a right to bifurcation at trial.  Furthermore, the Court of

Appeal thoroughly explored Petitioner's argument and did not find any fundamental

unfairness in Petitioner's trial:

> Defendants argue that the court erred in refusing to bifurcate the trial and
> the failure to bifurcate trial denied them a fair trial because the gang
> evidence was highly prejudicial and minimally relevant.

> On a motion to bifurcate trial of a gang enhancement, a defendant has the
> burden to clearly establish that a unitary trial creates a substantial danger
> of undue prejudice that requires the gang enhancement to be separately
> tried. (People v. Hernandez (2004) 33 Cal.4th 1040, 1051.) A denial of
> such motion is reviewed for abuse of discretion. (See id. at pp.
> 1048–1050.)

> The abuse of discretion standard is deferential and "asks in substance
> whether the ruling in question 'falls outside the bounds of reason' under
> the applicable law and the relevant facts [citations]." (People v. Williams
> (1998) 17 Cal.4th 148, 162.) Our review is based on the facts as they
> appeared at the time of the motion. (Cf. People v. Lewis (2008) 43 Cal.4th
> 415, 452 [denial of severance motion is reviewed for abuse of discretion
> based on the facts as they appeared when court ruled].)

> In People v. Hernandez, supra, 33 Cal.4th 1040, the California Supreme
> Court recognized that sometimes bifurcation of the trial of guilt and gang
> enhancements is appropriate: "The predicate offenses offered to establish
> a 'pattern of criminal gang activity' (§ 186.22, subd. (e)) need not be
> related to the crime, or even the defendant, and evidence of such offenses
> may be unduly prejudicial, thus warranting bifurcation. Moreover, some of
> the other gang evidence, even as it relates to the defendant, may be so
> extraordinarily prejudicial, and of so little relevance to guilt, that it
> threatens to sway the jury to convict regardless of the defendant's actual
> guilt." (Id. at p. 1049.)

> On the other hand, since a "criminal street gang enhancement is attached
> to the charged offense and is, by definition, inextricably intertwined with
> that offense" (People v. Hernandez, supra, 33 Cal.4th at p. 1048), "less
> need for bifurcation generally exists with the gang enhancement than with
> a prior conviction allegation. (See People v. Martin (1994) 23 Cal.App.4th
> 76, 81.)" (Ibid.) "To the extent the evidence supporting the gang
> enhancement would be admissible at a trial of guilt, any inference of
> prejudice would be dispelled, and bifurcation would not be necessary. (See
> People v. Balderas (1985) 41 Cal.3d 144, 171–172... [discussing severance
> of charged offenses].)" (Id. at pp. 1049–1050.)

> "Even if some of the evidence offered to prove the gang enhancement
> would be inadmissible at a trial of the substantive crime itself—for
> example, if some of it might be excluded under Evidence Code section 352
> as unduly prejudicial when no gang enhancement is charged—a court may
> still deny bifurcation. In the context of severing charged offenses, [the
> Supreme Court has] explained that 'additional factors favor joinder. Trial
> of the counts together ordinarily avoids the increased expenditure of funds
> and judicial resources which may result if the charges were to be tried in
> two or more separate trials.' [Citation.]" (Id. at p. 1050.) Although

41

bifurcation is not a perfect analogy to severance because "[s]everance of charged offenses is a more inefficient use of judicial resources than bifurcation" (ibid.), "a trial court's discretion to deny bifurcation of a charged gang enhancement is broader than its discretion to admit gang evidence when the gang enhancement is not charged. (See People v. Balderas, supra, 41 Cal.3d at p. 173.)" (Ibid.)

A defendant's "not guilty" plea generally puts all elements of the charged crime in issue for purposes of determining admissibility. (See People v. Daniels (1991) 52 Cal.3d 815, 858.) "In general, '[t]he People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent." [Citation.]' (People v. Gonzalez (2005) 126 Cal.App.4th 1539, 1550.)" (People v. McKinnon (2011) 52 Cal.4th 610, 655.)

Defendants did not demonstrate that gang evidence would be irrelevant to issues of defendants' motive and intent or witness credibility. (See Evid.Code, §§ 210, 351.) In addition, "[t]he rule is without exception that evidence which tends to show preparation looking to the commission of a crime, as well as acts and circumstances in pursuance of its accomplishment ..., is admissible against one charged with crime. [¶] So, too, the meeting together of persons, prior to the commission of a crime with which they are charged, and the circumstances thereof may be relevant to the questions of preparation and concert of action, and therefore may be properly brought to the attention of the jury." (People v. Arnold (1926) 199 Cal. 471, 492.)

In this case, gang monikers connected defendants Hensley and Rodriguez to the crimes. There was evidence that "J–Dog" participated in the planning of the robbery, preparations involved contacting the SJU gang to obtain cars, "Peanut" was the person who was going get the cars, and defendant Rodriguez's street name was "J-dog" and defendant Hensley's street name was "Peanut." There was evidence that defendant Rodriguez was wearing a black and white hat or cap while standing on the corner of Jones Way and Smith Avenue and those colors are sometimes worn by Shalu Gardens gang members. Also, some of the gang evidence was relevant to show why certain witnesses were reluctant to testify or gave testimony that was inconsistent with earlier statements to police. (See Evid.Code, §§ 210, 351.) [Petitioner] recognizes that gang evidence was relevant and admissible "to explain the testimony and conduct of prosecution witnesses...."

As in Hernandez, "defendants did not meet their burden 'to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried[ ]' ..." and the trial court "acted within its discretion in denying bifurcation." (People v. Hernandez, supra, 33 Cal.4th at p. 1051.) Neither have defendants shown that the failure to bifurcate violated due process.

In Spencer v. State of Texas (1967) 385 U.S. 554, the contention was that "the Due Process Clause of the Fourteenth Amendment requires the exclusion of prejudicial evidence of prior convictions even though limiting instructions are given and even though a valid state purpose—enforcement of the habitual-offender statute—is served." (Id. at p. 563.) The court

rejected the argument: "To say that the two-stage jury trial in the English–Connecticut style is probably the fairest, as some commentators and courts have suggested, and with which we might well agree were the matter before us in a legislative or rule-making context, is a far cry from a constitutional determination that this method of handling the problem is compelled by the Fourteenth Amendment. Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure." (Id. at pp. 567–568, fns. omitted.) It also stated: "Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial. [Citations.] But it has never been thought that such cases establish this Court as a rule-making organ for the promulgation of state rules of criminal procedure." (Id. at pp. 563–564.)

The U.S. Supreme Court has also observed: "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. We, therefore, have defined the category of infractions that violate 'fundamental fairness' very narrowly." (Dowling v. U.S. (1990) 493 U.S. 342, 352 [110 S.Ct. 668] [evidence of prior crime of which the defendant had been acquitted did not violate due process].) More recently, the Supreme Court has stated: "Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,' Dowling v. United States, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (internal quotation marks omitted), have we imposed a constraint tied to the Due Process Clause. See, e.g., Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (Due process prohibits the State's 'knowin[g] use [of] false evidence,' because such use violates 'any concept of ordered liberty.')" (Perry v. New Hampshire (2012) ―― U.S. ――――, ―― [132 S.Ct. 716, 723]; see People v. Falsetta (1999) 21 Cal.4th 903, 913 ["The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair. (Estelle v. McGuire (1991) 502 U.S. 62, 70, 112 S.Ct. 475, 116 L.Ed.2d 385; Spencer v. Texas (1967) 385 U.S. 554, 562–564, 87 S.Ct. 648, 17 L.Ed.2d 606.)"]; cf. People v. Fuiava (2012) 53 Cal.4th 622, 695–700 [admission of evidence of defendant's violent character did not offend due process].)

Further, in this case, the jury was instructed not to conclude from the evidence of gang activity that "the defendant is a person of bad character or that he has a disposition to commit crime." "We presume that jurors comprehend and accept the court's directions. (E.g., People v. Bonin (1988) 46 Cal.3d 659, 699.)" (People v. Mickey (1991) 54 Cal.3d 612, 689, fn. 17; see People v. Waidla (2000) 22 Cal.4th 690, 725 ["The presumption is that limiting instructions are followed by the jury"].)

We are not persuaded that the trial court's refusal to bifurcate trial of the gang enhancements "so infused the trial with unfairness as to deny due process of law." (Lisenba v. California (1941) 314 U.S. 219, 228 [62 S.Ct. 280].)

People v. Albarran (2007) 149 Cal.App.4th 214, on which defendants Hensley and [Petitioner] rely to argue that failure to bifurcate resulted in a fundamentally unfair trial, is distinguishable. "Albarran filed a motion for

1
2
3
4
5
6

a new trial asserting sufficient evidence did not support the gang allegations and that admission of irrelevant and prejudicial gang evidence warranted a new trial on all charges. The trial court granted the new trial motion with respect to the gang allegations based upon insufficiency of the evidence, but denied it as to the charged offenses, finding the gang evidence was relevant to issues of intent." (Id. at p. 217.) In a split decision, the majority agreed that the gang evidence was irrelevant and extremely prejudicial as to the charged offenses and directed the trial court to enter a new order granting the defendant's motion for a new trial on all charges because the gang evidence was " ' "of such quality as necessarily prevents a fair trial." ' [Citation.]" (Id. at pp. 217, 231–232.)

7
8
9

Albarran can be distinguished first because it did not concern a ruling on a pretrial motion to bifurcate. Second, unlike the situation in Albarran, defendants have not established that the evidence was insufficient to prove the gang enhancement allegations or the gang evidence had no legitimate evidentiary purpose.

10
11
12
13
14
15
16
17
18
19
20
21
22

Defendant Hensley additionally argues that the court's refusal to bifurcate trial compelled him "to select a strategy to minimize the damage that the gang charges could cause" and to waive his privilege against self incrimination and admit his involvement in the crimes but deny the gang allegations. Like many defendants facing a strong prosecution case, defendant Hensley was required to decide whether to exercise his constitutional right to remain silent or testify in his own behalf. In People v. Caro (1988) 46 Cal.3d 1035, abrogated on another ground as recognized in People v. Whitt (1990) 51 Cal.3d 620, 657, fn. 29, the California Supreme Court rejected a defendant's argument that "by allowing the introduction of evidence of killings for which he might at some future date be tried, the court forced him to surrender his right to testify at penalty phase in order to preserve his state constitutional privilege against self-incrimination as to the uncharged offenses." (Id. at p. 1055.) It stated: "The forced choice of which defendant complains is permissible under the federal Constitution. (See McGautha v. California (1971) 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711.)" (Id. at p. 1056.) The same is true here. As "the McGautha court observed: 'The criminal process ... is replete with situations requiring the "making of difficult judgments" as to which course to follow. [Citation.] Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.' (402 U.S. at p. 213, 91 S.Ct. at p. 1470.)" (Ibid.)

Zavala, 2013 WL 5720149, at *23–25 (footnotes admitted).

23
24
25
26
27
28

This Court only has discretion to entertain a petition for a writ of habeas corpus when an individual is imprisoned in violation of clearly established federal law. See § 2254. A writ can only be granted when the state appellate court reaches a decision that is opposite to the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. See Williams, 529 U.S. at

44

412–13.  The Supreme Court has very narrowly defined the category of infractions that violate a defendant's right to a fundamentally fair trial.  <u>Dowling v. U.S.</u>, 493 U.S. 342, 352 (1990).

The Court is aware of no Supreme Court decisions that instruct courts to bifurcate trials in any specific scenario.  Thus, Petitioner would need to demonstrate that his trial was fundamentally unfair due to the evidence presented on the gang allegations in his case.  <u>See</u> <u>Dowling</u>, 493 U.S. at 352.  The Court of Appeal found that Petitioner's trial was not rendered fundamentally unfair by the evidence presented to prove his gang affiliation.  <u>See</u> <u>Zavala</u>, 2013 WL 5720149, at *25.  The Court of Appeal thus determined that Petitioner's case did not fall into the narrow window of cases in which evidence admitted renders a trial fundamentally unfair.  The Court of Appeal again provides a detailed and thorough analysis of federal law regarding the fundamental unfairness in trials, and the role of bifurcation in trial.  <u>See</u> <u>Zavala</u>, 2013 WL 5720149, at *23–25.  The Court of Appeal's finding does not violate clearly established federal law, and therefore a writ is not warranted.

The court's determination is not unreasonable or contradictory to clearly established federal law, and a writ is not warranted under § 2254.

VII.    <u>The Testimony of the Prosecution's Gang Expert Was Appropriate</u>

Petitioner's final claim states that the prosecution's gang expert improperly relied on testimonial hearsay in his report.  <u>See</u> Pet. at 21–31.  Additionally, Petitioner asserts that the testimonial hearsay was used for the truth of what it asserts, in violation of Petitioner's confrontation clause rights.[2]  <u>See</u> Traverse at 46–47.  Petitioner's claim fails because: (1) experts are allowed to rely on testimonial hearsay, and (2) experts are allowed to describe the

---

[2] Petitioner's traverse also includes argument regarding whether or not Petitioner forfeited his confrontation clause argument by failing to object to the prosecution expert's statements at trial.  <u>See</u> Traverse at 42–46.  This Court will not address concerns of claim forfeiture, and will assume the claim is valid.

evidence they rely on in making their decision as long as they do not "parrot" out of court testimonial hearsay.

The Court of Appeal addressed Petitioner's confrontation clause, stating:

> The trial court did overrule [Petitioner's] confrontation objection to Sergeant Livingston's testimony explaining that his opinion that the crime was gang-related was based in part on "prior contacts, speaking with other people, reviewing police reports" indicating that the two primary people planning the crime were [Petitioner] and Rodriguez, two influential members of Shalu Gardens. The essence of [Petitioner's] objection was that Livingston's testimony implied that other nontestifying witnesses had made statements to police concerning their planning of the crime. The trial court could properly reject that argument since R.B. had already testified to the planning of the robbery and Sergeant Livingston did not allude to any other statement by a nontestifying witness to the planning of the robbery. Defendants have not pointed to any trial testimony recounting Moneyhun's or Stojkovic's statements to police concerning that planning.

> The trial court also overruled [Petitioner's] express confrontation objection to two out-of-court statements concerning the defendant's membership in the SLG gang, which were made to officers responding to a reported disturbance on November 19, 2005. Sergeant Livingston was one of the responding officers. The basis evidence was explicitly not admitted for its truth.

> In this case, the trial court permitted Sergeant Livingston to testify to the extrajudicial basis of his opinion as a gang expert based on principles of California law. (See People v. Gardeley, supra, 14 Cal.4th at pp. 617–619 [gang expert "could reveal the information on which he had relied in forming his expert opinion, including hearsay"].) "Expert testimony may ... be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions. [Citations.]" (Id. at p. 618.) "[B]ecause Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter ... upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion. [Citations.]" (Id. at pp. 618–619.)

> An out-of-court statement is not "hearsay evidence" if it is not admitted for the truth of the matter stated. (Evid.Code, § 1200, subd. (a); see Sen. Com. on Judiciary com., 29B, Pt. 4 West's Ann. Evid.Code (1995 ed.) foll. § 1200, p. 4 [A "statement that is offered for some purpose other than to prove the fact stated therein is not hearsay. [Citations.]"]; cf. Fed. Rules of Evid., rule 801(c).) The California Supreme Court has established that an expert witness's recitation of out-of-court statements for the nonhearsay purpose of showing the basis of the expert's opinion "does not transform inadmissible matter into 'independent proof' of any fact. [Citations.]"

(<u>People v. Gardeley</u>, <u>supra</u>, 14 Cal.4th at p. 619.) Here, the trial court repeatedly admonished the jury that the out-of-court statements relied upon by Sergeant Livingston could not be considered for the truth of the matters stated.

The California Supreme did not effectively overturn or limit <u>Gardeley</u> in its 2012 trio of Sixth Amendment confrontation cases: <u>People v. Rutterschmidt</u> (2012) 55 Cal.4th 650, 661 [any confrontation clause violation in admitting toxicology analysis of victim's blood was harmless because evidence of guilt was overwhelming]; <u>People v. Dungo</u> (2012) 55 Cal.4th 608, 621 [no confrontation violation since criminal investigation was not the primary purpose for the autopsy report's description of victim's body]; <u>People v. Lopez</u> (2012) 55 Cal.4th 569, 582 [critical portions of nontestifying analyst's laboratory report on defendant's blood alcohol concentration were not made with the requisite degree of formality or solemnity to be considered testimonial], 585 [notation in report linking defendant's name to blood sample was not prepared with the formality required for testimonial statements]. "[O]nly the ratio decidendi of an appellate opinion has precedential effect [citation]...." (<u>Trope v. Katz</u> (1995) 11 Cal.4th 274, 287.) None of the above cases even mentioned <u>Gardeley</u>.

We are well aware that <u>Gardeley</u> did not address a Sixth Amendment confrontation issue. But it is important to recognize that under California law, the mere admission of evidence of the basis for an expert's opinion, for the limited purpose of assessing the soundness of the expert's reasoning, does not transform the evidence into independent proof of any fact. (<u>People v. Gardeley</u>, supra, 14 Cal.4th at p. 619.) We therefore remain obliged to follow <u>Gardeley</u> until a U.S. or California Supreme Court decision dictates a different result.

In <u>Crawford</u>, the U.S. Supreme Court confirmed, consistent with its prior decision in <u>Tennessee v. Street</u> (1985) 471 U.S. 409, 414 (105 S.Ct.2078), that evidence not admitted for the truth of the matter stated does not implicate a defendant's constitutional right of confrontation. (<u>Crawford v. Washington</u>, <u>supra</u>, 541 U.S. at p. 60, fn. 9; see <u>Williams v. Illinois</u>, supra, 567 U.S. at p. 2228 (plur. opn. of Alito, J.) ["Out-of-court statements related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause"]; <u>but see id.</u> at p. 2257 (opn. of Thomas, J., concurring in judgment) ["statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose"]; <u>id.</u> at pp. 2268–2269 (dis. opn. of Kagan, J., joined by Scalia, Ginsburg, and Sotomayor, JJ.) [admission of an out-of-court statement to show the basis of an expert's conclusion "has no purpose separate from its truth"]. Post-<u>Crawford</u>, the California Supreme has stated: "Out-of-court statements that are not offered for their truth are not hearsay under California law (Evid.Code, § 1200, subd. (a); <u>Smith v. Whittier</u> (1892) 95 Cal. 279, 293–294...), nor do they run afoul of the confrontation clause. (See <u>Crawford v. Washington</u> (2004) 541 U.S. 36, 60, fn. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177.)" (<u>People v. Ervine</u> (2009) 47 Cal.4th 745, 775–776.) A plurality of the U.S. Supreme Court has observed that "there is simply no way around the proviso in <u>Crawford</u> that the Confrontation Clause applies only to out-of-court statements that are 'use[d]' to 'establis[h] the truth of the matter asserted.' 541 U.S., at 59–60, n. 9, 124

47

S.Ct. 1354...).” (<u>Williams v. Illinois</u>, <u>supra</u>, 132 S.Ct. at p. 2240 (plur. opn. of Alito, J.).)

“The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions. [Citation.]” (<u>People v. Mickey</u>, supra, 54 Cal.3d at p. 689, fn. 17; <u>see Richardson v. Marsh</u> (1987) 481 U.S. 200, 211 [107 S.Ct. 1702] [“The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process”].) “[T]he assumption that jurors are able to follow the court’s instructions fully applies when rights guaranteed by the Confrontation Clause are at issue. [Citation]” (<u>Tennessee v. Street</u>, supra, 471 U.S. 409, 415, fn. 6 [admission of accomplice’s confession for nonhearsay purpose accompanied by limiting instruction raised no confrontation clause concerns]; <u>see Williams v. Illinois</u>, supra, 132 S.Ct. at p. 2241 (plur. opn. of Alito, J.) [jury instruction that “out-of-court statements cannot be accepted for their truth” is safeguard against misuse].)

The <u>Williams</u> decision does not change our analysis. When the U.S. Supreme Court issues an opinion, “it is not only the result but also those portions of the opinion necessary to that result by which we are bound. [Citations.]” (<u>Seminole Tribe of Florida v. Florida</u> (1996) 517 U.S. 44, 67 [116 S.Ct. 1114], []) “When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, ‘the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds....’ [Citation.]” (<u>Marks v. U.S.</u> (1977) 430 U.S. 188, 193 [97 S.Ct. 990], [] (Marks ).) As Justice Chin observed in his concurring opinion in <u>People v. Dungo</u>, <u>supra</u>, 55 Cal.4th 608, “neither the plurality opinion nor Justice Thomas’s concurring opinion [in Williams ] can be viewed as a logical subset of the other. Indeed, to some extent they are contradictory.” (<u>Id.</u> at p. 628 (conc. opn. of Chin, J.).) In <u>Dungo</u>, Justice Chin noted that “[i]t took a combination of two opinions—each containing quite different reasoning—to achieve the majority result.” (<u>Ibid.</u>) Further, as the California Supreme Court has stated concerning <u>Williams</u>, “dissenting opinions are not binding precedent. [Citations.]” (<u>People v. Lopez</u>, <u>supra</u>, 55 Cal.4th at p. 585.) We do not believe that the common view expressed in Justice Thomas’s concurring opinion (in which no other justice joined) and the dissenting opinion in <u>Williams</u>, that the extrajudicial basis of an expert’s opinion is necessarily considered for its truth, regardless of its admission for a nonhearsay purpose with a limiting instruction, may be taken as a holding of the U.S. Supreme Court since it is not yet the basis of any judgment.

While dicta or a dissenting opinion may signal the future direction of a court, especially when a view is subscribed to by a majority of justices presently on the court, we must follow the U.S. Supreme Court’s binding precedents and leave to that court the prerogative of overruling its own decisions. (<u>See Agostini v. Felton</u> (1997) 521 U.S. 203, 237–238 [117 S.Ct. 1997].) Lower courts must be cognizant that the justices’ individual views and court membership may change. As Justice Liu has stated: “[N]ose-counting is a job for litigators, not jurists. As a court tasked with applying an evolving line of jurisprudence, our role is not simply to

determine what outcome will likely garner five votes on the high court. Our job is to render the best interpretation of the law in light of the legal text and authorities binding on us." (People v. Lopez, supra, 55 Cal.4th at pp. 593–594 (dis. opn. of Liu, J.).)

Every appellate justice is bound by controlling precedent, no matter how vehemently or persuasively the justice disagrees with it and no matter how accurately the justice can predict future high court decisions overturning or qualifying that precedent. The doctrine of stare decisis "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact." (Vasquez v. Hillery (1986) 474 U.S. 254, 265–266 [106 S.Ct. 617].)

"Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court. [Citations.]" (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.) "[Lower] [c]ourts are not at liberty to set aside or disregard the decisions of [the California Supreme] Court because it may seem to them that the decisions are unsound. Until reversed or modified by [the] Court, its decisions must be accepted by all inferior tribunals." (People v. McGuire (1872) 45 Cal. 56, 57–58.)

Of course, this court, like all state courts, is duty bound to follow the controlling precedent of the U.S. Supreme Court's decisions. (see U.S. Const., art. VI, cl. 2 [supremacy clause]; People v. Fletcher (1996) 13 Cal.4th 451, 469, fn. 6 [The U.S. Supreme Court's "decisions on questions of federal constitutional law are binding on all state courts under the supremacy clause of the United States Constitution. [Citations.]"].) The United States Supreme Court has "final authority to determine the meaning and application" of the federal Constitution. (Pennekamp v. State of Fla. (1946) 328 U.S. 331, 335 [66 S.Ct. 1029].) Its decisions on questions of federal law are "binding upon the state courts, and must be followed, any state law, decision, or rule to the contrary notwithstanding." (Chesapeake & O. Ry. Co. v. Martin (1931) 283 U.S. 209, 221 [51 S.Ct. 453].)

We will not try to count potential votes of the justices on either the U.S. Supreme Court or the California Supreme Court. As of yet, there is no U.S. or California Supreme Court case holding that testimony regarding the basis for an expert's opinion, which was not admitted for its truth at trial, must nevertheless be regarded as admitted for its truth for purposes of the Sixth Amendment's right of confrontation even when a limiting instruction is given. Presently, binding precedent is to the contrary.

Like the trial court, we are bound by the decisions of higher courts regardless of our personal views. The trial court properly concluded that, under presently controlling law, extrajudicial statements not admitted for their truth, but only to show the basis for an expert's opinion, do not implicate the confrontation clause. (See Williams v. Illinois, supra, 132 S.Ct. at pp. 2228 (plur. opn. of Alito, J.) [It is "settled that the Confrontation Clause does not bar the admission of statements not admitted for their truth"], 2235 (plur. opn. of Alito, J.) ["Crawford, while departing from prior Confrontation Clause precedent in other respects, took pains to reaffirm the proposition that the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing

49

1
the truth of the matter asserted.' [Citations.]"]; Crawford v. Washington,

2
supra, 541 U.S. at p. 60, fn. 9 [The confrontation clause "does not bar the
use of testimonial statements for purposes other than establishing the truth

3
of the matter asserted. [Citation.]"]; Tennessee v. Street, supra, 471 U.S.
409, 413–414, 417 [extrajudicial accomplice confession introduced not for

4
its truth, but for nonhearsay purpose of assessing defendant's testimony
that his own confession was coerced, raised no confrontation clause

5
concerns]; People v. Ervine, supra, 47 Cal.4th at p. 776; People v. Thomas
(2005) 130 Cal.App.4th 1202, 1209–1210; cf. People v. Hill (2011) 191

6
Cal.App.4th 1104, 1127–1128, 1131.)

Zavala, 2013 WL 5720149, at *44-48 (footnotes omitted).

7

8
    The Confrontation Clause of the Sixth Amendment provides that in criminal cases, the

9
accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend.

10
VI.  The federal confrontation right applies to the states through the Fourteenth Amendment.

11
See Pointer v. Texas, 380 U.S. 400, 403 (1965).

12

13
    The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but

14
it is a procedural rather than a substantive guarantee.  Crawford v. Washington, 541 U.S. 36,

15
61 (2004).  When expert testimony relies on out-of-court statements by others that Crawford

16
would bar if offered directly, "'[t]he question is whether the expert is, in essence, giving an

17
independent judgment or merely acting as a transmitter for testimonial hearsay.  As long as

18
he is applying his training and experience to the sources before him and reaching an

19
independent judgment, there will typically be no Crawford problem.'"  United States v.

20
Gomez, 725 F.3d 1121, 1129–30 (9th Cir. 2013) (quoting United States v. Johnson, 587 F.3d

21
625, 635 (4th Cir. 2009)).  But expert testimony that simply parrots the out of court

22
testimonial statements of others is barred by Crawford.  Gomez, 725 F.3d at 1129 (citing

23
Johnson).

24
    The Court of Appeal correctly applied clearly established federal law when it decided

25
Petitioner's claim on appeal.  The court examined the expert's statements that Petitioner

26
objects to, and noted that the expert is allowed to rely on the statements under Crawford as

27
well as the relevant Ninth Circuit cases dealing with the issue of testimonial hearsay.  See

28
Zavala, 2013 WL 5720149, at *44–48.  Currently, Crawford is the sole controlling authority

50

1   on testimonial hearsay as it relates to expert testimony.  Clearly established federal law

2   regarding expert testimony in the sphere of confrontation clause issues is therefore scant.

3   Thus, the Court of Appeal's analysis is adequate because it takes <u>Crawford</u> into account.  The

4   Court of Appeal, therefore, followed clearly established federal law in its analysis of

5   Petitioner's claim by examining the claim under <u>Crawford</u>.  <u>See Zavala</u>, 2013 WL 5720149,

6   at *44-48.  Additionally, the expert testimony does not appear to "parrot" testimonial

7   hearsay, and thus the statements do not run afoul of the Ninth Circuit's decision in <u>Gomez</u>.

8   <u>See Gomez</u>, 725 F.3d at 1129.

9
10      The Court of Appeal's decision does not contradict clearly established federal law,

11   and is in accordance with the current Ninth Circuit authority. As a result, Petitioner's claim is

12   denied.

13                                  **CONCLUSION**

14
15      After a careful review of the record and pertinent case law, the Court is satisfied that

16   the petition for a writ of habeas corpus under § 2254 must be DENIED.

17       Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of

18   appealability (COA) under 28 U.S.C. § 2253(c) also is DENIED because Petitioner has not

19   demonstrated that "reasonable jurists would find the district court's assessment of the

20   constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

21
22      The clerk shall enter judgment in accordance with this order and close the file.

23   **IT IS SO ORDERED.**

24

25

26   Dated: April 8 , 2016

27

28



CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE